March 21,&#125;
1876. &#125;                    BIXBY *v.* DUNLAP.

*Master and servant—Seduction of servant—Action for—Damages.*

When the relation of master and servant exists by virtue of a valid contract, the master may maintain an action on the case against any person who knowingly and wilfully induces the servant to break the contract and abandon the service.

Ordinarily, in actions for torts, the rule of damages is compensation in money for the money value of such damage as would naturally and reasonably be expected to happen to the plaintiff by reason of the wrongful act.

When the element of malice enters into the wrong, a more liberal rule of damages prevails, and the jury, taking into consideration all the circumstances of the wrong, ought to give as compensation what, in their judgment, it is reasonable that the plaintiff should receive and the defendant pay.

Damages estimated by this rule are sometimes termed vindictive, exemplary, or punitive; but these terms do not imply that the award of such damages is intended by law as a punishment for violation of criminal law.

Such damages are not a sum awarded in addition to the actual damage and separate from it, but are the whole damage, estimated by the more liberal rule which prevails in the case of malicious wrong.

Being intended as compensation for a wrong, and not as punishment for the violation of criminal law, such damages are not open to the objection that they expose the defendant to a double punishment.

ACTION ON THE CASE. Plea, not guilty. Writ dated May 3, 1872, contains five counts. The first sets out a contract for service between said plaintiff and one Albertina Larson, and charges the defendant with wrongfully and unjustly enticing, persuading, and procuring said servant to make default, and abandon said contract. The second count alleges that said Albertina Larson was the servant of the plaintiff, of which the defendant had knowledge, and that he did unlawfully, wrongfully, and unjustly entice, persuade, and procure her to depart from and out of said plaintiff's service. The third count alleges that said Albertina Larson departed and went away from and out of the plaintiff's service without consent, and that the defendant, knowing the premises, wrongfully and unjustly received her into his service, and harbored, detained, and kept her in his service from May 20, 1872, hitherto. The fourth count alleges that the said Albertina Larson was a servant of the plaintiff, and left the plaintiff's service without his consent, and the defendent, after notice and request not to do so, unlawfully, wrongfully, and unjustly harbored, detained, and kept said servant in his service from May 20, 1872, hitherto. The fifth count alleges said Albertina Larson to be the servant of the plaintiff, and that said defendant, knowing the premises, did wrongfully, unlawfully, and maliciously induce, persuade, and procure, by fraud, covin, and deception exercised over and upon said Albertina Larson, to depart from and out of the service of the plaintiff, and so remain from May 20, 1872, hitherto.

It appeared in this case that one Charles A. Bergland was engaged in the business of bringing servants from Sweden to America for such persons as desired. Said Bergland testified that in the fall of 1871 the plaintiff employed him (Bergland) as his agent to obtain for him a servant to do general housework in his family in Nashua. In November following Mr. Bergland had a servant whom the plaintiff could have had, but he declined, and concluded to wait until the following spring, when Mr. Bergland would be in Sweden and get him such a servant as the plaintiff desired. When the plaintiff employed Bergland as his agent to get him a servant, he advanced to said Bergland the sum of fifty dollars to pay passage-money and expenses, which was the price at that time. During the winter Mr. Bergland went to Sweden, and while there, in the city of Gottenburg, entered into a written con-

tract, as the agent of Bixby, with one Albertina Larson, a translation of which contract is as follows:

"Agreement with Mr. Charles A. Bergland from Boston. When undersigned, by Mr. Bergland, gets free passage and board as emigrant from Gottenburg to Boston, America, I engage myself to do general housework in the family of W. Bixby, in the city of Nashua, for one year, accounted from the day I begin my services, with wages during said year of seventy-five dollars currency besides the passage-money, and to leave Gottenburg for Boston, May 3, this year. If there should be any sufficient reasons at the time of my arrival in Boston that should prevent me from serving in said family, or any other family directed to me by Mr. Bergland, with the same wages, I have to pay the bearer of the contract fifty dollars currency as amends for passage and expenses.

" GOTTENBURG, April 29, 1872. 			ALBERTINA LARSON,
							Pen in the hand."

This contract remained in the possession of said Bergland from the time it was executed up to the time of the trial. On May 20, 1872, a large number of servants arrived in Boston, and among the number was Albertina Larson. The defendant having been informed by a Mr. Wellman that there were two spare servants who wanted to go to Nashua, went to Boston with Wellman to secure one for his family. One Welhelmia Lindberg was pointed out to him by Bergland as one of said spare servants, and said Dunlap selected her. Afterwards said Larson being pointed out by Wellman as the other spare servant, he selected her; but before leaving the wharf, Wellman received from Bergland a list of the girls going to Nashua, and the names of their employers, in which list said Larson's name was put down as going to Mr. Bixby; and Wellman testified that Bergland informed him that Larson was brought over for said Bixby, and that he (Wellman) so informed said Dunlap at the wharf. It also appeared that, on their arrival at Nashua, said Dunlap sent the Lindberg girl to Bixby's house, and the Larson girl to Wellman's, and the next morning went to Wellman's with his carriage and carried the Larson girl to his own house. There was evidence tending to show that she supposed she was at Bixby's house for the first three days. She entered Dunlap's service May 21, 1872, and so remained until January, 1873. On May 29, 1872, said Bergland having been informed that the Larson girl was at the wrong place, visited Nashua to induce her to leave the employ of the defendant and enter into the service of the plaintiff, which she declined to do. It was claimed by the plaintiff that efforts were made by Dunlap to induce her to remain in his employ; but this was denied by the defendant and his family. In July following, said Bergland called upon the defendant for fifty-five dollars, and on July 17, 1872, the defendant paid that sum to Bergland, taking a receipt of which the following is a copy:

" Boston, July 17th, 1872. Received of Mr. A. H. Dunlap fifty-five dollars for cost of procuring one domestic—Albertina Larson—from

Sweden, to be delivered in Boston soon as she can be procured. Sum advanced to be refunded from wages after arrival by the person ordered, or considered part of the wages for the first year.

<div align="center">(Signed) CHARLES A. BERGLAND."</div>

This receipt is endorsed on the back with the name of Charles A. Bergland, and also the following: "Albertina Larson came to Mr. Dunlap's May 21st, 1872." Said Albertina Larson never entered into the employment or service of the said plaintiff, and never performed any labor for him. The agreement, dated Gottenburg, April 29, 1872, was introduced in evidence, subject to the defendant's exception, and the jury were instructed that it was a valid contract between Albertina Larson and Bergland, and the question whether Bergland acted as the agent of the plaintiff in making it was left to the jury. The defendant requested the court to instruct the jury as follows:

1. That upon the evidence and upon the contract the relation of master and servant never subsisted between Albertina Larson and the plaintiff.

2. That the contract made by her and Bergland was not valid and binding ; that there was no mutuality, and under it the plaintiff cannot maintain this action. (The court declined to give the foregoing instructions.)

3. That, in order to be liable for enticing her away, there must have been an active and wrongful effort to detach her from the plaintiff's service [by offering inducements to that end]. (The court gave this instruction, except the part included in brackets, but declined to give that.)

4. That under the contract she had the right upon her arrival here to go where and engage with whom she pleased ; that if she refused for any reason, valid or not, to go where Bergland directed, she had the right to do so ; and the only damages that could be recovered of her would be the amount of the passage-money. That having been paid to Bergland, the plaintiff cannot recover. (The court declined to give this instruction.)

5. That the measure of damages in this case is the value of the services lost up to the time of the commencement of the action, viz., from May 21 to May 31 inclusive ; the reasonable and necessary expenses incurred in trying to get her back, or in getting one to supply her place ; and damages for the loss of time, trouble, and injury sustained until the commencement of this suit, May 31, 1872. (The court gave the foregoing instruction, with the addition of the following words inclosed in brackets, to the giving of which the defendant excepted.) [And for vexation and distress of mind caused by the unlawful act of the defendant.]

6. That the plaintiff is not entitled in this action to exemplary damages. (The court declined to give this instruction.)

The court allowed Bergland to testify that Bixby employed him as his agent to hire Albertina Larson, and that he so acted, to which the

defendant excepted. The defendant offered to inquire of Miss Larson as follows: "Did you understand, at the time you made the contract with Mr. Bergland, that when you got to America you had the right to go where you pleased, provided your passage-money was refunded to Bergland?" The court refused to allow the question to be answered, to which the defendant excepted.

The jury were also instructed, that if they found that Bergland acted as the agent of Bixby in making the contract with Miss Larson, they should then inquire whether he acted as Bixby's agent in rescinding the contract; that if he did so act, or if Bixby afterwards ratified what Bergland did without authority, then the taking of the fifty-five dollars from Dunlap, and the giving of the receipt dated July 17, 1872, would amount to a rescission, or a giving up of the rights of the plaintiff growing out of the contract. To these instructions no exception was taken.

On the question of exemplary damages, the jury were instructed that if they found that Dunlap acted in bad faith,—that is, that he was conscious that he was doing what he ought not to have done, conscious that he was interfering unjustifiably with the rights of the plaintiff, and tried to conceal the fact that Albertina Larson had been assigned to the plaintiff,—they might find exemplary damages by way of punishment, such damages as the plaintiff ought to receive and the defendant ought to pay. They were also instructed to return a special verdict stating the amount of the actual damages and exemplary damages separately. The jury having returned a verdict for the plaintiff for actual and exemplary damages, the defendant moved that the same be set aside.

The questions arising on the foregoing case were transferred to the superior court by RAND, J.

*Barrett* and *Wadleigh & Wallace*, for the plaintiff.

*Briggs & Huse* and *Morrison & Hiland*, for the defendant.

CUSHING, C. J. In the case of *Lumley* v. *Gye*, 20 Eng. L. & E. 168, the law on this subject is stated by CROMPTON, J., as follows:

"It must now be considered clear law, that a person who wrongfully and maliciously, or, which is the same thing, with notice, interrupts the relation subsisting between master and servant, by procuring the servant to depart from the master's service, or by harboring him and keeping him as a servant after he has quitted it, and during the time stipulated for as the period of service whereby the master is injured, commits a wrongful act, for which he is responsible at law, *     *     * and I think that the relation of master and servant subsists sufficiently for the purpose of such action during the time for which there is in existence a binding contract of hiring and service between the parties; and I think it is a fanciful and technical and unjust distinction to say that the not having actually entered into the service, or that the service not actually continuing, can make any difference." In this view of the law, Judges EARLE and

WIGHTMAN, of the court of Queen's Bench, concurred, while Mr. Justice COLERIDGE, in his dissenting opinion, did not deny this to be law in regard to such persons as would be considered servants within the "statute of laborers." His objection to the action in the case of *Lumley* v. *Gye* was, that the party whose contract for service was the subject of the action—Miss Wagner, a public singer and dramatic *artiste*—was not a servant within the statute of laborers ;—so that I understand that that decision must be considered as unanimous, so far as the action for seducing away a menial servant, as in the present case, is concerned.

The cases of *Campbell* v. *Cooper*, 34 N. H. 49, *Peter* v. *Blocker*, 43 Ga. 331, *Hart* v. *Aldridge*, Cowp. 54, and *Blake* v. *Lanyon*, C. D. & E. 222, may be referred to as substantially supporting the same doctrine.

According to Parsons on Contracts, B. 1, sec. 6, it would have been proper, in an action between Bixby and Larson, to show by oral testimony that Bixby was the principal, and therefore entitled to bring the action on the contract in his own name. If there were any doubt about the law in such a case, there could be no doubt in this case that it would be proper to show that Bixby was the owner of the beneficial interest in the contract, that he had paid the consideration, and that the contract was between Larson and himself.

The written contract, having been made in Sweden by parties there at that time, and contemplating at least a part performance there, I should suppose would be governed by the law of Sweden in regard to its binding effect and the form of its execution ; and I think, if the defendant wished to rely upon any positive legislation like the statute of frauds, that he would have to show that such was the law of Sweden ; and, in the absence of such proof, I think we may assume that a plain stipulation in which the party bound herself, that, in consideration of a free passage found her from Gottenburg to Boston, she would work a year for seventy-five dollars, would be held to be a sufficient contract.

If held to be governed by our law, it seems clear that it was a sufficient contract in writing for a valid consideration, expressed in the writing and proved to have been paid. As the consideration of Larson's contract was the payment by the plaintiff of the passage-money, and not a promise to employ her, the objection of want of mutuality seems not well founded.

If the law has been so far correctly stated, the first, second, and fourth objections seem to be sufficiently disposed of. I do not see any reason why the instructions given, as in the third request of the defendant, were not well enough without adding the words, "by offering inducements to that end." I do not see how those words can add anything to the other instructions. I do not see how there could be any enticing to leave the plaintiff's service, without suggesting something by way of inducement.

This, I believe, disposes of everything, excepting the question about exemplary damages.

That question involves the consideration of the much discussed law in regard to what are called vindictive, exemplary, or punitive damages. These terms are used sometimes separately, and sometimes all together,—not always, perhaps not often, with much scientific accuracy, but yet always with a pretty well understood and consistent sense of the object to be attained.

Ordinarily, in actions for torts, the rule of damages is compensation in money for the damage sustained by reason of the natural and obvious consequences of the wrongful act. I believe the doctrine of remote and proximate causes has finally reduced itself to this. The wrongful act is the proximate cause of all the damage which ought reasonably and naturally to be expected from it. Always, however, the damage must be something which has a money value, and which can be estimated in money. No doubt, if my neighbor negligently drives his wagon against my ornamental fence, he will damage me to the extent of the money value of the necessary repairs ; and if the damage is of such a description that it cannot be made good by repairs, there may be a further sum capable of being estimated in money. It is probable, also, that the injury will be attended with great vexation and distress of mind, perhaps not so great as, and perhaps greater than, another might suffer. It is obviously impossible to put any money value upon this worry and vexation of mind. If a party, by want of ordinary care, damages his neighbor's fence, it cannot be that ordinarily the compensation is to be determined by the peculiarities of temper or disposition of the injured party. Mr. Webster, in his great speech in answer to Mr. Hayne, speaking of some occasions of unpleasantness, said he had "used philosophy." It cannot be that the compensation in money which is to be made for a damage of this kind can be made to depend on the capacity of the plaintiff to mitigate his vexation of mind by the use of philosophy.

So, also, in regard to the expenses of litigation. It very often, perhaps in a majority of cases, happens that the injured party, after receiving his estimated damages and his taxable costs, finds himself seriously out of pocket, yet the necessary and unavoidable expenses of litigation rarely enter as an element into what is spoken of in the cases as actual damage. I am not undertaking now to suggest any new ideas, but simply to state as well as I can, from my recollection of the cases, what the law is. I think I cannot be mistaken in the suggestion that this damage, which is spoken of in the many cases as actual damage, always means damage upon which a money value can be put, and which can in that sense be compensated in money.

When, however, the element of malice enters into the wrong, the rule of damages is different and more liberal. I think it is equally well settled that in such cases there enter into the question of damages considerations which cannot be made the subject of exact pecuniary compensation,—such as were described in the charge of the count as mental distress and vexation, what in common language might be spoken of as offences to the feelings, insult, degradation, offences against

honest pride, and all matters which cannot arise except in those wrongs which are attended with malice.

The action which we are now considering is one in which damages are sought to be recovered for interfering with the relations existing between master and servant. It is familiar to the profession what a wide range this form of action has been made to take, how many cases there are where the damages in money by reason of the loss of service, which is the gist of the action, are trivial and hardly more than nominal, and yet may be swollen by aggravating circumstances to an enormous amount.

The case of *Goddard* v. *Grand Trunk R. R. Co.*, 57 Me. 202 (2 Am. R. 39), is an illustration of an application of the same principle to a different class of cases. In that case the defendant's servant, a brakeman, while in discharge of his duty, assaulted the plaintiff with circumstances of great aggravation and insult, although there was no actual battery, and there was no evidence of any pecuniary loss sustained by the plaintiff. Among other circumstances of aggravation, it was in evidence that the corporation, having notice of the conduct of the brakeman, had continued to retain him in their employment. The court instructed the jury that if the evidence was found to be true, it was a proper case for punitive or exemplary damages. The jury rendered a verdict for $4,850, which was sustained by the court. The defendant corporation was held answerable for the malicious act of its servant done in the way of his ordinary employment, and the verdict was sustained ; not because of any actual pecuniary loss which could be estimated and compensated in money, but on account of the circumstances of aggravation attending the wrong.

In the endeavor to bring such considerations within the grasp of the law, and as far as possible to compensate such wrongs by damages, courts have used the terms punitory, vindictive, exemplary. I do not think that the cases show, in so far as I have examined them, that this has ever been considered as punishing an offence against the criminal law of the state, but simply as a mode of stating the matter so as to bring this almost intangible subject within the grasp of the law. Whenever the law is so held that the jury are instructed that they may leave the domains of actual pecuniary value, and go into speculations in regard to compensation for the wounded feelings, the offended pride, the outraged sense of decency and delicacy, they have come into the domain of what the law has been accustomed to call punitive, vindictive, or exemplary damages. It is of little consequence under what name it goes. The substance of the thing must be retained, unless a very large class of cases are to be stricken from the list of actionable wrongs.

In the case of *Hawes* v. *Knowles*, 114 Mass. 518, the head note is as follows :

"If there is wantonness or mischief, causing additional bodily or mental damage in the injurious act of a servant within the scope of his employment, the wantonness or mischief will enhance the damages as against the master."

GRAY, C. J., says,—" In an action in tort for a wilful injury to the person, the manner and manifest motive of the wrongful act may be given in evidence as affecting the question of damages." " The evidence introduced at the trial, so far as it is reported in the bill of exceptions, was, that the defendant's servant, driving the defendant's coach, drove against the wagon of the plaintiff wantonly, as well as carelessly and negligently." " As applied to this evidence, the instruction given, fairly construed, was only that if, in the act done by the servant in the performance of the master's business by which the plaintiff was injured, there was wantonness or mischief on the part of the wrong-doer which caused additional injury to the plaintiff, in body or mind, it would tend to enhance the damages. Thus construed, the instruction was unexceptionable."

According to these views it is incorrect to separate what is called actual damage from what is called exemplary damage. The rule is not, as I understand it, to instruct the jury in the first place to determine the actual money damage which the plaintiff has sustained, and then further instruct the jury that if they find the defendant has been malicious they may give another separate sum, in damages by way of example, or for the sake of punishment. The true rule, as I understand it, is, to instruct the jury that, if they find the defendant has been malicious, the rule of damages will be more liberal ; that, instead of awarding damages only for those matters which are capable of exact pecuniary valuation, they may take into consideration all the circumstances of aggravation,—the insults, offended feelings, degradation, and so on,—and endeavor, according to their best judgment, to award such damages by way of compensation or indemnity as the plaintiff on the whole ought to receive and the defendant ought to pay. The case of *Fay* v. *Parker*, 53 N. H. 342, recently decided in this state, affords a good illustration of my views. There the jury were instructed, without saying anything about the defendant's motives, that they might give as compensation damages for all those matters which are usually spoken of as actual damage, and for all those matters which are usually spoken of as exemplary damages. Then they were told that if they thought proper they might go further, and punish the defendant.

So, in the case at bar, the jury were told that they might award compensation for what were termed actual damages, including vexation and distress of mind ; and further, if they thought proper they might add another sum, not by way of compensation, but for something else.

If the jury had not been instructed to give compensation and punishment in separate sums, but had been told that if they found the defendant malicious they might adopt a more liberal rule of damages, and give by way of compensation and indemnity all which in their judgment, under all the circumstances, the plaintiff ought to receive and the defendant ought to pay ; and the court had gone on and explained to the jury that this class of damages, although clearly not to be appreciated in any money value, still might be taken into considera-

tion and so satisfy the plaintiff's feelings; and that damages of this class were sometimes called vindictive, because they had a tendency to satisfy the just indignation of the plaintiff and the jury, and sometimes called exemplary, because they would have the effect of calling public attention to the wrong and the remedy, and punitory, because, although intended by law to operate as compensation, they would have the effect of and be felt as punishment by the defendant, it is quite likely the verdict, though larger than what was given under the first part of the actual charge, would have been sustained by the court.

It was unavoidable, in the case of *Fay* v. *Parker*, that the punitive part of the verdict should be set aside; but it would seem that in fact the whole verdict should have been set aside, because the plaintiff had a right to the benefit of the more liberal rule of damages if the defendant was malicious. And precisely so in this case, I think, the verdict should be set aside, unless the plaintiff is content to remit all that part of the verdict which came under the head of exemplary damages.

I have thus endeavored to bring into some consistent form and statement what seems to me to be the result of the cases and discussions which are to be found in the books.

In the case of *State* v. *Burnham*, PARKER, C. J., in the course of his learned and able discussion, uses the following language: " It would be an idle and vain attempt to endeavor to reconcile all the discussions in the books upon the subject of libel and slander. Many of the cases which have been cited to some of the points in this opinion contain other principles not in accordance with it, and which of course we cannot be understood as adopting. But the distinctions now attempted to be sustained will perhaps in some degree reconcile the decisions themselves." I have somewhat the same feeling in regard to the numerous cases on the subject of what are called vindictive damages. I am aware that there are many cases the language of which is not in harmony with the language I have used; but it appears to me that it is more a question of language than of law. While those cases speak of inflicting punishment, I think they really confine the jury to those considerations which, perhaps, all lawyers admit enter into the question of damages by way of compensation for malicious injuries. I think the spirit of those cases is entirely in harmony with the views I have suggested as being the result of all the cases on the subject; and, while what I have said is a criticism, I hope not unjust, of the language of some of the cases, I certainly do not consider this opinion as overruling their real spirit and intent.

The cases on this subject are legion. Many, perhaps most of them, are referred to in the case of *Fay* v. *Parker*. Indeed, it is scarcely possible now to open a volume of reports, or a digest of new cases, without finding abundant evidence that this doctrine of a more liberal rule of damages in actions for malicious injuries still maintains its hold wherever the doctrines of the common law prevail.

It appears somewhere in the briefs that the compensation under the first branch of the charge was fixed at $150, and the exemplary or

punitive damages fixed at $500. As the plaintiff has a right to a more liberal charge on the subject of damages, he will be entitled to have the whole verdict set aside if any part of it is. We shall not, therefore, set aside a part merely. If the plaintiff thinks proper to remit the $500, he may have judgment for the other part of the verdict;— otherwise, the verdict must be set aside.

LADD and SMITH, JJ., concurred.

<div align="right">

*Judgment accordingly.*