## LAURA BAUMGARTNER *vs.* HENRY EIGENBROT AND WIFE.

*Hearsay Testimony—Action For Abducting and Harboring an Infant— Insufficient Evidence to Support.*

When a part of certain hearsay evidence is given by a witness before objection to it is made, the Court may, in its discretion, either rule out the testimony so given at once, or reserve the question of its exclusion till the close of the case.

In an action charging the abduction of a female infant, a witness was asked to state what the infant had said to him concerning defendant's promises to her if she would go to live with the defendant. *Held*, that such evidence is hearsay and incompetent.

Plaintiff was the guardian of her niece, an orphan about seventeen years

of age, whom she had reared from infancy. After making visits to the defendant, another aunt, the girl expressed a desire to accept defendant's invitation to live with her, provided plaintiff would allow her to visit her former home occasionally. Plaintiff at first refused to permit such visits if her niece went away, but finally gave her consent, and the girl took up her residence with the defendant. Then the plaintiff brought this action, charging the defendant in one count of the declaration with abducting the infant and in another with harboring her after abduction. *Held*, that upon this evidence the plaintiff is not entitled to recover, since the infant was not taken from the plaintiffs' custody by the use of any such force, fraud or persuasion as constituted abduction, and was not received and kept in defendant's custody in a clandestine or improper manner.

Appeal from the Superior Court of Baltimore City (PHELPS, J.)

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE, SCHMUCKER and JONES, JJ.

*S. S. Field*, for the appellant.

*William Colton* (with whom was *Frank I. Duncan* on the brief), for the appellees.

McSHERRY, J., delivered the opinion of the Court.

This is an appeal from the Superior Court of Baltimore City. Suit was instituted there by Laura Baumgartner against Henry Eigenbrot and Louisa Eigenbrot, his wife, to recover damages for an alleged abduction of a niece of the plaintiff by the defendants. There are two counts in the declaration. By the first count it is stated that the plaintiff stood towards a certain Matilda Joh *in loco parentis :* That Matilda was an infant, who had been confided to the plaintiff by its mother, who was the plaintiff's sister, and that the plaintiff upon the death of the infant's mother took the said infant to her home and there maintained her just as if she had been her own child ; and that the plaintiff became greatly attached to her and derived great comfort from her society as she grew to be larger. It is further alleged that the plaintiff had been duly appointed by the Orphans' Court of Baltimore City, guardian for the said

infant and that the defendant, Louisa, in July, 1901, abducted the said Matilda from the plaintiff and has ever since harbored her at the home of the defendants, the said Henry Eigenbrot being a party thereto with full knowledge that the infant had been abducted by his wife.  By the second count of the declaration it is alleged that after the plaintiff had occupied the relation aforesaid to the above-named infant, and after she had raised her in her home and had become attached to her as though she were her own child and had taken her at her mother's request, before the latter's death, and after the said infant had been supported and nurtured by the plaintiff when she was small; the said Louisa knowing the premises and desiring to secure for the defendants the services of the infant, she being nearly grown, did in July, 1901, persuade and induce the said infant from the home of the plaintiff and took her to live with the defendants, and that the said Louisa endeavored to poison the mind of the said infant against the plaintiff and for that purpose spoke slanderously and evilly about the plaintiff to the said infant and that both the defendants have ever since harbored and kept the said infant against the wishes of the plaintiff, "the said Henry well knowing that the infant had been induced away from the plaintiff by his wife," by reason whereof the plaintiff was deprived of the society and affection of the infant and was otherwise injured and damaged.  To this declaration a demurrer was interposed by the defendants but it was overruled and thereupon they pleaded that they did not commit the wrong alleged, upon which issue was joined and the case went to trial before a jury. We need not pause to consider the demurrer.  During the progress of the trial three exceptions were reserved, two of which relate to the rulings of the Court on the admissibility of evidence and the third concerns its action on a motion and a prayer presented by the defendants at the close of the plaintiff's case.  The prayer presented at the close of the plaintiff's case instructed the jury that no legally sufficient evidence had been offered tending to prove that the said Louisa Eigenbrot abducted the said Matilda from the plaintiff and has ever since

harbored and kept her at the home of the defendants.    In obedience to that instruction a verdict was rendered by the jury in favor of the defendants upon which judgment was entered, and the plaintiff thereupon took this appeal.

The first exception requires but little discussion.    The plaintiff herself in testifying proceeded to narrate a conversation which had been repeated to her by Matilda Joh, whereupon the counsel for the defendants interrupting the witness asked her, "Did you hear all that?" and the witness replied, "Tillie told me that," and then the cousel for the defendants objected to what the witness was saying and the Court promptly sustained the objection and refused to permit the witness to narrate what had been said to her by Matilda. Thereupon the counsel for the plaintiff said, "That does not affect what went in without objection" and the counsel for the defendants immediately replied: "I will ask your Honor to additionally rule" whereupon the Court interposing said: "We will reserve that question until the close of the case." To that action of the Court the plaintiff excepted and this constitutes the first bill of exception.    It is apparent that there was no error in the ruling excluding the hearsay testimony which the witness was proceeding to give, nor in the ruling by which the Court reserved until the close of. the case the request to strike out so much of the hearsay testimony as had been injected before the objection was interposed.    The hearsay testimony was clearly incompetent, and if the witness succeeded in narrating a portion of it before the counsel could interpose an objection, it was within the province of the Court's discretion to either rule it out at once or to reserve the question until the close of the case and then exclude it.    Its exclusion at the close of the plaintiff's case was not erroneous. The second exception is of a kindred character.    A witness was called to the stand and was asked to state what Matilda Joh told him, shortly before she went to the defendants, as to what Mrs. Eigenbrot had promised her if she would go there. The question was objected to and the Court declined to admit the evidence.    There can be no doubt, we think, as to the

propriety of this ruling. The proffered evidence was clearly hearsay and inadmissible to bind the defendants. Matilda Joh was herself a competent witness and the plaintiff could have called her to the stand to prove what inducements, if any, the defendants or either of them had held out to her to persuade her to leave the plaintiff; but, to permit her statements made to some third person out of the presence and hearing of the defendants to be given in evidence to bind the latter would violate the most fundamental rule excluding hearsay evidence. The reasons upon which the rule is founded are clearly stated by Mr. Reynolds in his admirable treatise on the *Theory of the Law of Evidence*, sec. 17. "The reasons for the rule excluding hearsay, or, as Mr. Best more accurately terms it, 'derivative evidence,' are not difficult to discover, for apart from the circumstance that the probabilities of falsehood and misrepresentation, either willful or unintentional, being introduced into a statement are greatly multiplied every time it is repeated, there remains the further fact that the original statement, even if correctly reported, has scarcely ever been made under the safeguards of the personal responsibility of the author as to its truth, or the tests of a cross-examination as to its accuracy. It is indeed, true, that, in the ordinary affairs of life, men often act upon information received at second hand, but this is seldom done in matters of much importance, unless either they or their informants possess sufficient personal knowledge of the party from whom the statement originated to form an intelligent estimate of his general disposition to speak the truth, the temptation he may be under to deceive, and his probable means of accurate information in regard to the subject-matter of his statement. Such personal knowledge, the Courts can rarely possess, and therefore, three tests have been provided, to which, in general, all statements must be subjected before being admitted as evidence in judicial proceedings. These are: 1. That the statement must be made under the moral obligation of a solemn oath or affirmation, with the liability to a criminal prosecution for perjury in case of falsehood. 2. That the party against

whom the testimony is given shall have the opportunity of
cross-examining the witness, in order to elicit his sources of
information as well as any material facts within his knowledge
which he may not be disposed to disclose voluntarily, and
also to test the general accuracy of his statements, and to show
if he has any bias in regard to the matter in dispute.    3. That
the witness should give his testimony in open Court, in order
that the jury may observe his demeanor while giving it."

This brings us to the last question in the case, namely, the
ruling of the Court declaring that the plaintiff had failed to
offer legally sufficient evidence to support the averments of
the declaration.    It will be remembered that the first count
in the declaration charges the defendant, Louisa, with abduct-
ing the infant, Matilda Joh, and that the second count charges
the defendants with harboring her after she had been so ab-
ducted.    In 1 *Cyc.* 141, it is said, "Abduction in its broadest
legal sense signifies the act of taking and carrying away by force,
which may be by fraud, persuasion or open violence a child,
ward, wife, etc.    In its more restricted sense it is confined to
the taking of females for the purpose of marriage, concubinage
or prostitution."    In 1 *Am. & Eng. Ency.*, 163, it is said,
"Abduction is the unlawful taking or detention by force, fraud
or persuasion of a person, as a wife, a child or a ward from the
possession, custody or control of the person legally entitled
thereto."    In 15 *Am. & Eng. Ency.*, 285, it is said, "In the
law of torts, to harbor is to receive clandestinely or without
legal authority, a person for the purpose of so concealing him
that another having the right to the legal custody of such per-
son shall be deprived thereof   *   *   *   or in a less technical
sense, it is a reception of persons improperly."    We are not
called on to determine or indicate every instance in which a de-
fendant may be liable for abducting or harboring an infant; but
under the prayer which was granted the single question for
consideration is whether the evidence offered in *this* case is
sufficient to support the declaration.    The solution of that
question requires a brief examination of the leading and pre-
dominant facts contained in the record.

The girl, Matilda Joh, is a niece of both the plaintiff and the defendant, Mrs. Louisa Eigenbrot. Matilda is the daughter of the plaintiff's sister. Matilda's father was a brother of Mrs. Eigenbrot. Just before the death of Matilda's mother, when Matilda was ten years old, her mother requested the plaintiff to take care of her. This the plaintiff did until July, 1901, when Matilda went to the defendant's house to live. About March or April, 1901, Matilda paid a visit to her aunt, Mrs. Eigenbrot, and remained there for nearly four months. In July, 1901, Mrs. Eigenbrot, Lollie, the eldest sister of Matilda, and Matilda went to the home of the plaintiff, and Lollie stated that Mrs. Eigenbrot would like to have Matilda. The plaintiff testified as follows concerning what then transpired: "Mrs. Eigenbrot told me at my house that she would like to have Tillie. Of course, she had her out there now these four months and she was so much pleasure to them she said it would not be like out there, it was so lonesome out there. At my house it was not so lonesome as it was out there, she said sometimes no one was passing there, and here, of course, every five minutes there is some one passing. She said she was so much company to them and I says well you did not need her when she was little how is it you want her now, and she said her Uncle Hen., as she called him, was getting old and I too and it was so lonesome now, and I said she didn't want her when she was young and now she is big and I have had all the trouble with her you want her." The witness then proceeded to say that she and Mrs. Eigenbrot had words together and they both sat there crying for ten or fifteen minutes and Mrs. Eigenbrot said, "Tillie go upstairs and get your clothes, so Tillie cried. Tillie didn't want to go if she couldn't come in to see me any more. I said if you go you will go to stay you cannot come in to see me any more if you go. You will go to stay, that was what I told her, and Mrs. Eigenbrot begged me to let Tillie come in when she felt like coming, she knew she would get homesick after she was out there awhile and they would not let her come home, she repeated to me, there is no place like home." The witness further proceeded to state

that Tillie said she didn't want to go if she couldn't come back any more. And then Mrs. Eigenbrot "begged me and said I should say that she could come back whenever she felt like coming and I said she wouldn't have any luck after taking her away after my taking her from her mother all these years and kept her all these six or seven years after her death. I said she wouldn't have any luck at my having her all these years." The plaintiff then went on to say that Matilda and her sister Lollie went to get Matilda's clothes. "I said," continued the witness, "she could come in and see me when she felt like it. I told her that, and then she went and got her clothes after I said I allowed her to get her clothes she got them, I never touched any, because Mrs. Eigenbrot and I were talking in the parlor when Lollie went upstairs and got the clothes. I told her her skirts were in the cupboard and she said she had got them. That was all I told her. I didn't help her they came in to get her clothes after keeping her there four months. Then she left with Mrs. Eigenbrot." It appears further from the testimony of the plaintiff herself that she sent to the defendants a bill for $60.00 for the services of Matilda, at the rate of $10 a month for the time Matilda was at the defendants and that this bill was not paid. She was then asked upon cross-examination, "When did it occur to you to sue him, the defendant, for the first time? You sued him because he would not pay you the bill $10 a month. If he had paid you $10 a month there would not be any occasion for this contention," and her answer was, "No, sir." This is the evidence upon which the plaintiff relies to maintain the declaration.

Here was a girl nearly eighteen years of age, an orphan, who had been cared for by one aunt, the plaintiff, and who after paying a visit to another aunt equally near to her, evidently preferred to remain with the latter, provided she was permitted to visit the former occasionally. According to the plaintiff's own evidence, the plaintiff refused to permit the girl to visit her if she left her home and went with the defendant, but finally upon the importunity of both the girl and the de-

fendant, Mrs. Eigenbrot, the plaintiff relented and agreed that she would allow Matilda to visit her and thereupon Matilda went to live with her aunt, the defendant. Now in all this there is not an element of abduction as it has been defined in the authorities cited in an earlier part of this opinion. Confessedly there was no force used. There was no fraud. There was no open violence and there is no evidence to indicate that there was persuasion of any kind. It would be going a long distance beyond what any case has held to say that the facts we have heretofore given in detail fasten upon the defendants or either of them the charge of abduction. And as to the second count of the declaration there is not any evidence whatever to show that Matilda was received clandestinely for the purpose of concealing her from the plaintiff nor is there anything to indicate that her reception by the defendants was in any sense improper.

We conclude then from this review of the evidence in the record that the Court below was entirely right in declining to permit this case to go to the jury. As we find no error in any of its rulings the judgment which was rendered in favor of the defendants will be affirmed with cost.

*Judgment affirmed with costs above and below.*

(Decided March 21st, 1905.)