CLARK, C. J., concurring. *Page 406 
This was a criminal indictment against the defendant. The bill of indictment charges that "With force and arms, at and in the county aforesaid, unlawfully, wilfully and feloniously did abduct and elope with Mrs. Jesse Gilbert, wife of Jesse Gilbert, she, the said Mrs. Jesse Gilbert, since her marriage having been an innocent and virtuous woman."
The defendant did not introduce any testimony.
The State introduced Jesse Gilbert, husband of prosecutrix, who testified as follows:
"That he and Grace Gilbert were married in 1916; that her maiden name was Grace Brooks and that they were married at Spray; that they lived in Spray up to two or three months before the beginning of this trial; that his home was on Morgan Street in front of the Methodist church, but that he was staying with his mother on Flynt Hill and boarding there at the time of the alleged happening. That he first discovered his wife's absence on 19 January, 1923, when he came home from the mill; that he knows Walter Hopper and that he lived two or three hundred yards away in the same neighborhood where the witness boarded. That Walter Hopper is a married man and has a wife and three children. That Walter Hopper's wife was the witness's cousin; that his wife was gone from the 19th day of January to the 17th day of March, when he caught her; that he caught her in West Durham; that he never saw Walter Hopper any more; he was missing from Spray until the trial (preliminary hearing in Spray); that he did not know where they caught him, but heard they caught him in Danville. Defendant testified that he and his wife lived together up to that time."
Mrs. Grace Gilbert, prosecutrix, testified:
"That she is the wife of Jesse Gilbert; that the defendant and her husband were friends, and that he was at their home real often, and that he over-persuaded her to go away from her husband.
"Q. Tell how often he talked to you about — persuaded you to leave there before you actually went? A. Daily, about ten months.
"That the defendant was taking meals at the same place she and her husband boarded, but stayed at his home at night, and that he begged her to leave with him daily for about ten months, and that before they went he told her to go to Stoneville and get on the train and he would go to Ridgeway and get on the same train (Stoneville being in North Carolina and Ridgeway in Virginia); that this was the train going to Winston-Salem, and that they would go away and get a divorce and be married. That they went to Greensboro and from Greensboro to *Page 407 
Birmingham, Ala., and stayed there one night; that they went to different towns in Alabama and lived as man and wife; then I (meaning the prosecuting witness, Grace Gilbert) came back to Durham and the defendant went somewhere else; that he said he was going to Burlington, but he did not go to Burlington and she did not know where he went; that the defendant had opportunities to talk to her while she was keeping house for her husband's mother. That he is about 32 or 33 years old and that she (meaning the prosecuting witness, Grace Gilbert) is 23 years old; that up to the time she was induced to leave her home she was innocent of any man outside her husband, except him; that up to that time no man had had unlawful intercourse with her. That previous to the time the defendant had improper relations with her he had discussed the matter of their leaving together and getting a divorce; that he had nothing to do with her before the discussion."
On cross-examination she said, in part, that she did not remember whether she said in the recorder's court anything about Hopper persuading her away; that she did not leave the State and go to Virginia to keep from testifying; that she went to Lynchburg to work in the overall factory, but came back to attend court; that defendant talked to her and persuaded her for about ten months.
"Q. You deny that Walter Hopper or anybody else had any unlawful relations with you up to the time you left Spray? Answer: I deny any one.
"Q. Then you admit he had unlawful relations with you before he left Spray? Answer: Yes, just a little while.
"Q. How long? Answer: I don't remember how long; just a month or so, I suppose.
"Q. Would it be one month or two months? Answer: Three months. That they left in January, and that she supposed it was in October previous or some time along there when they first had unlawful intercourse."
She admitted that she drew out of the bank $490 of her own money when she left and went to Stoneville. That she paid her railroad fare from Spray to Stoneville, and from Stoneville. That defendant bought the tickets in Greensboro to Birmingham, Ala., and that he borrowed the money from her and promised to pay it back. That she did not know he had no money until they got away from home. That she had been in bathing with him. That he got the bathing suit at the house, hanging on the porch; that his wife was going in bathing with them but she decided not to go in. That his wife was with them at the time.
R. D. Shumate and P. S. Gillie both testified that Mrs. Grace Gilbert's general character was good. The State rests.
Defendant moved to nonsuit under C. S., sec. 4643 (Mason Act). *Page 408 
The court did not rule on the motion; court took recess for dinner. Upon convening of court after dinner, solicitor for the State recalled Jesse Gilbert and examined him; this being allowed by the court in its discretion, to which the defendant excepted.
Jesse Gilbert, for the State, testified:
"Q. What do you know about your wife's chastity and conduct up to the time of this man's invasion of your home?
"Q. Up to the time she went away? Answer: It was all right so far as I know.
"Q. What was the condition of Hopper's wife and family at the time he left? Answer: They were sick in bed.
"Q. Who was sick in bed? Answer: The kids and his wife were sick.
"Q. Do you know whether they had funds or support, or anything to go upon? Answer: I do not know, only except they made up some money. I do not know.
"Q. Did he own their home they were living in? Answer: No, sir, he did not own his home.
"Q. Did his wife have any estate or property? Answer: Had the stuff in the house.
"Q. Did he have anything else? Answer: No, sir.
"Q. State whether or not his wife and children had any means of support other than his labor? No answer."
All these questions were objected to and exceptions taken.
Mrs. Grace Gilbert, recalled by the State, testified:
"Q. Please state if, at the time you say this man persuaded and induced you to leave your home, whether or not he said anything then about your furnishing the money to go on? Answer: He did not." Objection and exception.
Defendant renewed his motion for judgment of nonsuit, which was refused by the court. Objection and exception.
The court charged the jury on the law, as he interpreted it to be, and applicable to the crime charged, and gave the contentions of the State and defendant. The exceptions by the defendant to the charge, material to the decision of this case, are hereafter set out.
The jury returned a verdict of guilty. The solicitor prayed judgment of the court, and the defendant was sentenced to the State's Prison for a period of four years. The defendant excepted and appealed to this Court, and assigned as errors:
First was to the question asked Jesse Gilbert: "You don't know where they caught him?" and allowing him to answer, "I heard they caught him in Danville."
Second was in failing to grant nonsuit when the State rested, and to the court permitting the State, after the court had failed to rule, to put on more testimony, and after the noon recess. *Page 409 
Third was to the court's permitting the witness, Jesse Gilbert, to be recalled and asked the question, "What do you know about your wife's chastity and conduct up to the time of this man's invasion of your home," and allowing him to answer, "It was all right so far as I know."
The next seven were to the testimony of Jesse Gilbert when he was recalled, after the State rested, beginning with the question, "What was the condition of Hopper's wife and family at the time he left."
Eleventh was to the court's permitting Grace Gilbert to be recalled after the State rested and motion made to nonsuit, and being asked the question, "Please state if, at the time you say this man persuaded and induced you to leave your home, whether or not he said anything then about your furnishing the money to go on," and to answer, "He did not."
The other exceptions and assignments of error are to the charge as given by the court, but we will consider only the fourteenth and fifteenth exceptions, which embrace substantially all the other exceptions to the charge that are material:
Fourteenth. "The statute says that if a woman voluntarily leaves her husband for the purpose of going away with another man to indulge in intercourse with him — that the man who leaves and goes away with a woman who has voluntarily left her husband for that purpose is guilty of elopement."
Fifteenth. "Abduction may be accomplished either by force — the woman may be carried away by force against her will — or one may be carried away where she has been induced to go by fraud or deceit or persuasion — be carried away in that way, led away as the term implies, and in furtherance of the scheme of going away to leave her husband and elope — if, while persuading her and trying to induce her to leave, a man accomplishes her seduction, then it is no defense that before leaving he induced her to engage in intercourse with him, if she up to that time, when in furtherance and as a part of a scheme of getting her to leave, or inducting her to leave as it were, induced her to engage in sexual intercourse with him, she would still be an innocent and virtuous woman if she has never known any other man except her husband, and this was accomplished in the scheme he was carrying out of leading her away, abducting her, and the abduction would be referred to the time he had carried on the scheme or enterprise of carrying her away, leading her away, getting her away."
The defendant was indicted under the following statute: "If any male person shall abduct or elope with the wife of another he shall be guilty of a felony, and upon conviction shall be imprisoned not less than one year nor more than ten years: Provided, that the woman, since her marriage, has been an innocent and virtuous woman: Provided further, that no conviction shall be had upon the unsupported testimony of any such married woman." C. S., 4225.
The essential elements of the crime are: (1) If any male person shall abduct or elope with the wife of another. (2) The woman since her marriage has been an innocent and virtuous woman. (3) That no conviction shall be had upon the unsupported testimony of any such married woman.
What is the meaning of abduct or elope? The word "abduct" or "abduction" is from the Latin word "abduco" — to lead away.
Shepherd, J., in S. v. Chisenhall, 106 N.C. at p. 679, quotes Ashe,J., in S. v. George, 93 N.C. 567, as follows: "Our statute is broad and comprehensive in its terms, and embraces all means by which the child may be abducted," and further says: "The crime is defined in the statute by the term `abduction,' which is a term of well-known signification, and means, in law, `the taking and carrying away of a child, a ward, a wife, etc., either by fraud, persuasion or open violence.'" Webster's Dictionary. SeeS. v. Burnett, 142 N.C. 581; Humphrey v. pope, 54 P. 847 (122 Cal. 253) ; Baumgartner v. Eigenbrot (100 Md. 508), 60 Atl., 601-3; Carpenter v.People, 8 Barb., 606.
The word "elope" Webster defines: "To run away, to escape privately, from the place or station to which one is bound by duty; said especially of a man or woman, either married or unmarried, who run away with a paramour or sweetheart."
"Elope." — The departure of a married woman from her husband and dwelling with an adulterer, although the courts in many of the earlier cases exclude the conception "adultery" from the meaning of the word. 20 C. J., 402.
"Yet now by the statute, Westminster 2 (a part of the common law of this State), if a woman voluntarily leaves (which the law calls eloping from) her husband and lives with an adulterer, she shall lose her dower, unless her husband be voluntarily reconciled to her." Cooley's Blackstone (3d Ed.), Vol. 1, sec. 130.
"These authorities declare an elopement to be an act of the wife, who voluntarily deserts her husband to go away with and cohabitate with another man." S. v. O'Higgins, 178 N.C. 709.
What is the meaning of innocent and virtuous woman? "An innocent and virtuous woman is one who never had illicit intercourse with any man and who is chaste and pure." S. v. Whitley, 141 N.C. 826; *Page 411 S. v. Ferguson, 107 N.C. 841. See cases cited in S. v. Johnson,182 N.C. 888. Hardin v. Davis, 183 N.C. 47.
Walker, J., in S. v. Johnson, supra, says: "But we may pause here to state that, on the next trial, it will be proper for the court to instruct the jury that if the prosecutrix had committed adultery with the man who afterwards became her husband, even though it was often repeated before marriage, yet if, after she thus fell, she married her lover and was always faithful to him, and ever, after the first act of adultery with him, was innocent and virtuous, that is, had not had sexual intercourse with any man until the defendant seduced her under promise of marriage, if he did such a thing, then that she would be an innocent woman, and if she was also chaste and pure in the sense above defined, she also would be a virtuous woman within the meaning of the statute. An adulteress may reform and become innocent and even virtuous, and if this woman has done so, the statute protects her just as much as if she had never fallen, but had always walked in the straight and narrow way of spotless innocence, virtue, and chastity, not even permitting undue familiarity from any man, and especially the debaucher."
What is the meaning of "Unsupported testimony of any such married woman?" "The virtuous character and conduct of the prosecutrix was proved, so the testimony of the injured was not `unsupported' but derived confirmation from that of others, as the statute prescribes." S. v. Horton,100 N.C. 448. See S. v. Moody, 172 N.C. 967, and cases cited. This supporting evidence may consist of evidence of good character which supports the allegation that the prosecutrix is innocent and virtuous. S.v. Cooke, 176 N.C. 735. The burden was on the State to prove the married woman was innocent and virtuous. S. v. Connor, 142 N.C. 700.
The first assignment of error was to the question asked Jesse Gilbert, "You don't know where they caught him," and allowing him to answer, "I heard they caught him in Danville." The record shows no exception to this question or answer. This assignment cannot be considered. Rules of Practice in Supreme Court, Rule 21, 185 N.C. 795; Byrd v. Southerland, per curiam,ante, 384.
The second assignment of error "was in failing to grant nonsuit when the State rested and to the court permitting the State, after the court had failed to rule, to put on more testimony and after the noon recess." The court below had discretion in the conduct of the case. This Court will not review this discretion under the facts of this case.
"While the necessity for exercising this discretion in any given case is not to be determined by the mere inclination of the judge, but by a sound and enlightened judgment, in an effort to attain the end of all law, namely, the doing of even and exact justice, we will yet not supervise it except, perhaps, in extreme circumstances, not at all likely to *Page 412 
arise; and it is therefore practically unlimited." Jarrett v. Trunk Co.,142 N.C. 469; May v. Menzies, ante, 144.
The third assignment of error was to the court's permitting the witness Jesse Gilbert to be recalled and asked the question, "What do you know about your wife's chastity and conduct up to the time of this man's invasion of your home?" and allowing him to answer, "It was all right, so far as I know." This very point was decided that it was competent in S. v.O'Higgins, supra.
The next seven assignments of error were to the testimony of Jesse Gilbert, when he was recalled, after the State rested, beginning with the question, "What was the condition of Hopper's wife and family at the time he left?" This kind of testimony was objected to in S. v. O'Higgins, supra, and Brown, J., said: "The evidence that the defendant abandoned his motherless children in order to elope with Mrs. Miller was competent to prove how strong the infatuation was which induced him to leave his own children in a helpless condition in order to elope with another man's wife."
The eleventh assignment of error was to the court's permitting Grace Gilbert to be recalled, after the State rested and motion made to nonsuit, and being asked the question, "Please state if, at the time you say this man persuaded and induced you to leave your home, whether or not he said anything then about your furnishing the money to go on," and to the answer, "He did not."
As already stated, the court below, in its sound discretion, had the power to allow this witness to be recalled and examined. The testimony given was bearing on the abduction, which can be done by fraud, persuasion, or open violence. It was for the purpose of showing that, after he had persuaded and induced her to consent to leave, and she had yielded to the "studied, sly, ensnaring art . . . dissembling smooth" of the seducer, that nothing was said to her about her furnishing the money to go away on, and also to contradict any inference that may be drawn from the fact that on cross-examination she testified that she herself had drawn money out of the bank when she left. It was to strengthen the contention of the State that this woman, caught in the "snare of the fowler," was "helpless." "Behold! as the clay is in the potter's hand, so are ye in my hand."
The fourteenth assignment of error is to the charge, as follows: "The statute says that, if a woman voluntarily leaves her husband for the purpose of going away with another man to indulge in intercourse with him, that the man who leaves and goes away with a woman who has voluntarily left her husband for that purpose is guilty of elopement." This charge is a correct statement of the meaning of elopement in the statute. This is the meaning given by Blackstone, supra, and S. v. O'Higgins, supra. *Page 413 
The most serious assignment of error is that part of the fifteenth, in which the court charged: "If, while persuading her and trying to induce her to leave, a man accomplishes her seduction, then it is no defense that, before leaving, he induced her to engage in intercourse with him, if she, up to that time, when in furtherance and as a part of a scheme of getting her to leave, or inducing her to leave, as it were, induced her to engage in sexual intercourse with him, she would still be an innocent and virtuous woman, if she had never known any other man except her husband," etc. The able attorneys for the defendant argued with great force that this intercourse was going on at least three months before her departure; that criminal statutes should be construed strictly, and the prosecutrix would not be an innocent and virtuous woman as contemplated by the statute. We cannot so hold.
The statute was made to protect the home against the lust and passion of evil men, who subtlely, slyly and cunningly would creep into the family circle and poison its fountain source — the woman in the home. Can a man, through fraud, persuasion or deceit, go into a home and seduce the wife, who up to that time was an innocent and virtuous woman, and then abduct or elope with her, and, after having despoiled her — "despoiled of innocence, of faith, of bliss" — claim she was not innocent and virtuous? We do not think he could thus escape the wrong done.
It is a maxim of law, recognized and established, that nullus commodumcapere potest de injuria sua propria (no one can obtain an advantage by his own wrong). Broom's Legal Maxims, (8th Ed.), p. 279.
In Carpenter v. The people, 8 Barbour's Supreme Court Reports (N. Y.), p. 603, the statute was, "any unmarried female of previous chaste character"; the evidence was: "It was proved that, after she left home, she had been living, boarding and cohabiting with the defendant; but that was no evidence that she had cohabited or had illicit intercourse with any other person than him. It appeared that the defendant had been in the habit of visiting the said Louisa for a considerable length of time before she left home, as aforesaid, and that, up to the time of her acquaintance and intercourse with the defendant, her reputation for chastity was good." The defendant was convicted, and appealed. The Court, in passing upon the meaning of "an unmarried female of previous chaste character," said: "We think the words referred to do mean actual personal virtue — that the female must be actually chaste and pure in conduct and principle up to the time of the commission of the offense. Not that this must be the case up to the moment of taking her away for the purpose mentioned, but that it must be so up to the commencement of the acts of the party accused — done with the purpose *Page 414 
indicated, and which result in such taking away. The process of inveigling and enticing may be the work of time, and, when commenced, the female must be of caste character in the sense above defined."
In the case of South v. State, 97 Tenn. Reports, p. 496, although the statute does not use the words "innocent and virtuous," the Court, in that case, under a statute which provides that "any person who takes any female from her father, mother, guardian, or other person having legal charge of her, without his or her consent, for the purpose of prostitution or concubinage," etc., says: "The circuit court charged the jury that if they found beyond a reasonable doubt that the girl was living with her parents a chaste and virtuous life toward all others except defendant, and that defendant wilfully took her from her father without his consent, for the purpose of and intending to prostitute her, then he would be guilty, as charged, although it might appear that prior thereto defendant had sexual intercourse with her. This, we are of opinion, is good law, and in principle is sustained by the case of Davis v. Young (90 Tenn. 304), 6 Pickle, 304. The defendant cannot be allowed to take advantage of his acts in seducing the girl to defend himself for enticing or taking her away from her parents and home. It is evident in this case that, no matter what her previous conduct may have been, she had repented, and at the time she went or was carried to defendant's store, she was attempting, under his advice and direction, to leave the county." To same effect is S. v. Johnson,supra.
From a careful review of the whole record, we can find no reversible error.
No error.