STATE v. VERNON R. TEMPLE.

(Filed 13 October, 1954.)

1. **Abduction § 5—**

In order to establish the defendant's guilt of eloping with a married woman in violation of G.S. 14-43, the State must establish that at the time of the commission of the offense the wife was innocent and virtuous.

2. **Same—**

Evidence that a married woman had retained her innocence and virtue through some 20 years of married life and through more than 15 months of professions of love for her by defendant, and that she did not yield to defendant until some six days prior to the actual elopement, and after he had asked her to marry him, is sufficient upon the question of her innocence and virtue, since the requirement of the statute is fulfilled if her

innocence and virtue existed at the beginning of the acts of the defendant which in sequence led to the elopement.

**3. Same—**

> In a prosecution under G.S. 14-43, an instruction that the married woman must have been innocent and virtuous at the time of the elopment "or at sometime prior to the elopement," has the effect of denying the defendant the benefit of the proviso in the statute, and must be held for prejudicial error.

**4. Criminal Law § 34e—**

> In order for testimony of hearsay statements to be competent as an implied admission of guilt on the part of defendant, it must not only appear that the statements were made in the presence of defendant, but also that the circumstances were such as to call for a denial on the part of defendant and that he had opportunity to do so.

APPEAL from *Parker, J.,* June 1954 Term, JOHNSTON Superior Court.

The indictment in this case charged that the defendant ". . . on April 20, 1953, with force and arms, unlawfully, willfully, and feloniously did elope with one Estelle Dunn, the wife of Fraddy Dunn, an innocent and virtuous woman, against the form of the statute . . ."

Estelle Dunn, a witness, testified: "I am 36 years old. Fraddy Dunn and I were married in 1932. We have eight children living and two dead. I had never seen Vernon Temple until 1951 when Fraddy rented a crop from him. We stayed on his farm until the last of December 1951, or the first of January 1952. Vernon came to our house frequently and brought liquor about every time he came. He and my husband would drink together and my husband would get drunk. Vernon had a wife and two children. They were not living together. We moved to a house on John A. Johnson's place. Vernon Temple did not make any improper advances toward me prior to the time we moved from his farm. After we moved to Johnson's place he told me he loved me and I told him I loved him. For about nine months, from January to November, I did not see him. However, he stayed at our house about two weeks in November. He and my husband would drink and eat together. My husband told him he was welcome to stay. During that time he did not suggest having sexual relations with me, but he told me he loved me and I told him I loved him. I did not see him again until March, 1953. I did not write to him and he did not write to me.

"In March, 1953, he came back up home and stayed off and on for about four weeks, until we left. He again told me he loved me. He had helped my husband work on the farm and I was glad he was there. My husband was drinking all the time from March until April, 1953. I was glad to get away from him because of his drunken condition. I told him about two weeks before if he didn't get sober and go to work I was going to leave

him. The first time Vernon promised to marry me was about a week before we left. Vernon first had intercourse with me, I think, on Tuesday morning about six o'clock in his automobile outside our house. The second time was on Thursday and the third time was on Friday. On Friday, I believe, he told me he had a case coming up in recorder's court on Monday and that he did not intend to face trial. On Saturday he mentioned to me for the first time about leaving. I did not tell anyone I was going. My husband had been drinking. We left in Vernon's 1952 Pontiac about 12 o'clock at night on Sunday. On Monday night we stayed in a road cabin in Harlem, Georgia, then went to Rosewell, Georgia. We stayed in Georgia from about April 20 until May 23. Then we left and went to Chicago. We first got a room and stayed in a hotel. Later we got an apartment and lived together as husband and wife until we were arrested on October 12, 1953."

The witness testified that she had never had sexual relations with any person except her husband and Vernon Temple. When asked the reason she submitted to the defendant, the plaintiff replied she did because she wanted to.

Estelle Dunn's father and her son both testified as to Temple's being at the Dunn home. The father testified that on one occasion he visited his daughter and as he entered the front door the defendant went out the back door. Fraddy was drunk at the time. The son, then 15, called the deputy sheriff to come and take Temple away from the home.

Evidence of the good character of Estelle Dunn was offered.

Ernie Beasley, a deputy sheriff, testified that he went to Fraddy Dunn's home on one occasion, found Fraddy drunk on the bed, and Vernon Temple in the house. "I do not believe that Estelle Dunn was there at that time. I went back on another occasion and the best I remember, Mrs. Dunn was there, Fraddy was drunk, and Vernon Temple was there.

"I began an investigation on information that I received regarding Vernon Temple and Estelle Dunn. I went to the Vernon Temple home and he was not there. I continued looking for him for around six or seven months. Pursuant to information I received, Mr. Haywood Starling, an agent of the SBI, and I went to Chicago by airplane. We found Vernon Temple and Estelle Dunn in the city jail. We took Temple and Mrs. Dunn and went to the apartment that they had lived in. We found their clothes in one of the rooms. Their stuff had been moved out and stored in another place in the basement. We brought Vernon Temple and Mrs. Dunn back to North Carolina. Vernon Temple told me that they left Johnston County and went to Georgia but they wound up in Chicago. He said that they had lived together as man and wife."

Lalon Barbour testified: "I live in Dunn and I am a sister of Estelle Dunn. On or about the 20th day of August (probably April) 1953, I

saw Vernon Temple at my home in Harnett County about 11:30 or a quarter to 12 in the nighttime. Well, they came up and blew the horn and woke us up. Estelle came to the door and called me. I got up and she came in. Temple was in the car. Vernon did not come in the house, not that night, but they came in the house, Estelle Dunn and Fraddy Dunn. Temple was in the car. Estelle's children and this colored man were along. I had a conversation with my sister about the children. That was not the first time Temple and my sister had been in my house. They had been several times. Sometimes they would come once or twice a week. My sister came to my house many times when Temple was not with her. I imagine I saw Vernon Temple at Estelle's and Fraddy Dunn's as many as 10 times."

At the conclusion of the State's evidence, motion for judgment as of nonsuit was made and overruled. Defendant excepted. The defendant rested without offering evidence and renewed the motion, which was again overruled. The defendant again excepted. The jury returned a verdict of guilty, judgment was pronounced, from which the defendant appealed.

*Attorney-General McMullan and Assistant Attorney-General Moody for the State.*

*J. R. Barefoot and E. Reamuel Temple, Jr., for defendant, appellant.*

HIGGINS, J. The defendant was indicted under Section 14-43 of the General Statutes of North Carolina, as follows:

"*Abduction of married women.*—If any male person shall abduct or elope with the wife of another, he shall be guilty of a felony, and upon conviction shall be imprisoned not less than one year nor more than ten years: Provided, that the woman, since her marriage, has been an innocent and virtuous woman: Provided further, that no conviction shall be had upon the unsupported testimony of any such married woman."

The indictment charged elopement, not abduction. Defendant's counsel contend the court should have sustained the motion for judgment as of nonsuit for the reason that Estelle Dunn at the time of the elopement was not an innocent and virtuous woman, for that she had admitted that on Tuesday, Thursday, and Friday before leaving on Sunday she had had sexual intercourse with the defendant because as she said, "she wanted to." The elopement was first planned on Saturday and the actual leaving took place on Sunday night. However, for more than a year the defendant had been professing his love for Mrs. Dunn. He seemed to have gained a welcome to the home by furnishing liquor to the husband and making love to the wife. The Dunn's spent the year 1951 on Temple's farm and made a crop there. The evidence showed that Temple was

frequently in and about the home. The last of December, 1951, or the first of January, 1952, the Dunn's moved away from the Temple farm and moved to the Johnson place. In November of 1952 the defendant spent approximately two weeks in the Dunn home. During that time the son of 15 became so concerned about what was going on that he went for the deputy sheriff and had the defendant arrested.

For approximately one month, 20 March to 20 April, the defendant had again lived in the Dunn home. According to the wife's story he had asked her to marry him about a week before they left. The proposal of marriage was before the first act of intercourse.

The indictment charges that at the time of the commission of the offense the wife was an innocent and virtuous woman. The law requires proof of that fact before a conviction can be had. Mrs. Dunn testified that even as to the defendant she had retained her innocence and virtue through more than 15 months of professions of love and until after he had asked her to marry him. It is not surprising, therefore, that this conduct led to elopement. If innocence and virtue existed at the beginning of the acts on the part of the defendant which in sequence led to the elopement, the requirement of the statute is fulfilled. In the case of *S. v. Hopper,* 186 N.C. 405, 413, 119 S.E. 769, this Court said:

"The statute was made to protect the home against the lust and passion of evil men, who subtly, slyly and cunningly would creep into the family circle and poison its fountain source—the woman in the home. Can a man, through fraud, persuasion or deceit, go into a home and seduce the wife, who up to that time was an innocent and virtuous woman, and then abduct or elope with her, and, after having despoiled her—'despoiled of innocence, of faith, of bliss'—claim she was not innocent and virtuous? We do not think he could thus escape the wrong done.

"It is a maxim of law, recognized and established, that *nullus commodum capere potest de injuria sua propria* (no one can obtain an advantage by his own wrong). Broom's Legal Maxim's, (8th Ed.), p. 279.

"In *Carpenter v. The People,* 8 Barbour's Supreme Court Reports (N.Y.), p. 603, . . . the Court, in passing upon the meaning of 'an unmarried female of previous chaste character,' said: 'We think the words referred to do mean actual personal virtue—that the female must be actually chaste and pure in conduct and principle up to the time of the commission of the offense. Not that this must be the case up to the moment of taking her away for the purpose mentioned, but that it must be so up to the commencement of the acts of the party accused—done with the purpose indicated, and which result in such taking away. The process of inveigling and enticing may be the work of time, and when commenced, the female must be of chaste character in the sense above defined.' "

In the *Hopper case* the first act of intercourse took place more than three months before the actual elopement.

While the motion for judgment as of nonsuit was properly overruled, nevertheless the case must go back for a new trial because of error committed in the charge, the objection to which is raised by defendant's exception No. 57. The court charged:

"So, in this case it is necessary for the State of North Carolina to satisfy you from the evidence, and beyond a reasonable doubt, that the defendant Vernon Temple abducted and eloped with the wife of another; (2) That at the time, or some time prior to the elopement, the married woman was a chaste and pure, or innocent and virtuous woman; (3) That there shall be supporting testimony as to the statements of Estelle Dunn, about which the Court has already instructed you; that is, that there is supporting testimony, but that the weight of that testimony is entirely within the discretion of you members of the jury; that is, the weight that you give to that testimony."

The court charged: "It is necessary for the State . . . to satisfy you from the evidence and beyond a reasonable doubt . . . (2) That at the time *or at some time prior to the elopement* the married woman was a chaste and pure, or innocent and virtuous woman."

The charge, as given, lifts part of the burden the statute placed upon the State. The statute says: "Provided, that the woman since her marriage has been an innocent and virtuous woman." The charge, as given, permitted the State to carry the burden imposed by showing that the woman, *at some time prior to elopement* was an innocent and virtuous woman. Every woman is innocent and virtuous *at some time.* The battle line of the case was whether the wife, *at the time of elopement* (as hereinbefore defined) was an innocent and virtuous woman as contemplated by the first proviso in the Act. The charge as given was equivalent to striking out this proviso. The error, therefore, was prejudicial.

Some serious questions arise on the record with respect to the admissibility of evidence. Witnesses were permitted to testify to hearsay statements of a prejudicial nature if made in the presence of the defendant, regardless of whether the statements were of such character as might be deemed to require an answer on the part of the defendant or that his failure to answer might lead to an inference of guilt or guilty knowledge. To make competent the statement of others, more must appear than the mere fact the statements were made in the presence of the defendant. With respect to the admissibility of this type of evidence, the correct rule is stated by former *Chief Justice Stacy* in the case of *S. v. Wilson,* 205 N.C. 376, 171 S.E. 338, from which we quote:

"When a statement is made, either to a person or within his hearing, implicating him in the commission of a crime, to which he makes no reply,

the natural inference is that the imputation is perhaps well founded, or he would have repelled it. *S. v. Suggs,* 89 N.C. 527. But the occasion must be such as to call for a reply. 'It is not sufficient that the statement was made in the presence of the defendant against whom it is sought to be used, even though he remained silent; but it is further necessary that the circumstances should have been such as to call for a denial on his part, and to afford him an opportunity to make it.' 16 C.J., 659.

"Silence alone, in the face or hearing of an accusation, is not what makes it evidence of probative value, but the occasion, colored by the conduct of the accused or some circumstance in connection with the charge, is what gives the statement evidentiary weight. *S. v. Burton,* 94 N.C. 947; *S. v. Bowman,* 80 N.C. 432. 'To make the statements of others evidence against one on the ground of his implied admission of their truth by silent acquiescence, they must be made on an occasion when a reply from him might be *properly expected.* But where the *occasion* is such that a person is not called upon or expected to speak, no statements made in his presence can be used against him on the ground of his presumed assent from his silence.' *Ashe, J.,* in *Guy v. Manuel,* 89 N.C. 83.

"Due to the manifold temperaments of people and their varying conceptions of the fitness of things, the character of evidence we are now considering is so liable to misrepresentation and abuse that the authorities uniformly consider it as evidence to be received with great caution and, except under well recognized conditions, hold it to be inadmissible altogether. Hence, unless the party at the time was afforded a fair opportunity to speak, or the statements were made under circumstances and by such a person as naturally called for a reply, the evidence is not admissible at all. *S. v. Jackson,* 150 N.C. 831, 65 S.E. 376. 'The silence of the accused may spring from such a variety of motives, some of which may be consistent with innocence, that silence alone is very slight evidence of guilt; and, aside from the inference which may arise from the attendant circumstances, should be received with caution as proof of guilt.' Underhill Crim. Ev. (3rd Ed.), sec. 209. It is readily conceded that 'mere shadows of confessions,' which arise from silence in the face of accusations, are not to be received in evidence unless they amount to admissions by acquiescence. *S. v. Butler,* 185 N.C. 625, 115 S.E. 889. *Qui tacet non utique fatetur, sed tamen verum est eum non negare.* 'He who is silent does not indeed confess, but yet it is true that he does not deny.' "

We refrain from discussing further the exceptions to the admissibility of evidence on the ground that the questions presented by them may not arise on another trial.

On account of the prejudicial error in the charge, the case must go back to the Superior Court of Johnston County for a

New trial.