945 A.2d 1244

Afaf Nassar KHALIFA, et al.

v.

Michael SHANNON.

No. 56, Sept. Term, 2007.

Court of Appeals of Maryland.

April 9, 2008.

William C. Brennan, Jr. (William A. Mitchell, Jr., Brennan Sullivan & McKenna LLP, Greenbelt), on brief, for appellants.

Stephen J. Cullen (Miles & Stockbridge P.C., Towson, Edward W. Brady, Fratus/Brady, LLC, Annapolis), on brief, for appellee.

Argued before BELL, C.J., RAKER, HARRELL, BATTAGLIA, GREENE, ALAN M. WILNER (Retired, specially assigned), and DALE R. CATHELL (Retired, specially assigned), JJ.

BATTAGLIA, J.

The issue in this case is whether a cause of action for intentional interference with custody and visitation rights is sustainable by a father, Michael Shannon, against his former wife, Nermeen Khalifa Shannon, and her mother, Afaf Nassar Khalifa ("Appellants"), both of whom fled to Egypt with the couple's two minor children, who remain there. Appellants moved to dismiss the father's complaint, arguing that interference with custody and visitation rights is not a cognizable cause of action in Maryland, and alternatively, that even if Maryland recognizes the tort, the Complaint fails to allege a loss of the children's services, which is a required element. The trial court disagreed, and after a trial, the jury awarded $3,017,500 in compensatory and punitive damages. Appellants noted an appeal to the Court of Special Appeals, and prior to any proceedings in that court, we issued a writ of certiorari on our own initiative, *Khalifa v. Shannon*, 400 Md. 647, 929 A.2d 889 (2007), to address the following issues:

I. Did the trial court commit reversible error when it denied the defendant-appellants' motion to dismiss Count One of the Complaint by recognizing the tort of interference with custody and visitation rights of children?

II. Did the trial court commit reversible error when it denied the defendant-appellants' motion to dismiss Count Two of the Complaint by recognizing the tort of civil conspiracy? [1]

---

1. Because we hold that the tort of interference with custody and visitations rights is recognized in Maryland, we need not reach the

III.   Did the trial court commit reversible error when it denied the defendant-appellants' motion for a new trial, and/or for remittur, because the punitive damages awarded by the jury were grossly excessive and there was no evidence on the record of defendant-appellants' ability to pay?

We shall hold that the trial court did not err in denying Appellants' motion to dismiss Count I relating to interference with custody and visitation rights because we have heretofore recognized the tort without requiring the loss of services of the child to be pled.   We also shall hold that the trial court did not err when denying Appellants' post-trial motions regarding damages.

## I.   Facts

Michael Shannon initiated the instant civil suit against his ex-wife, Nermeen Khalifa Shannon, her mother, Afaf Nassar Khalifa, her father, Mohammed Osama Khalifa, and her older sister, Dahlia Khalifa, in March of 2004.   The Complaint contained four counts:   Count I, Interference with Custody and Visitation Rights of Children;  Count II, Civil Conspiracy; Count III, Loss of Society of Children;  and Count IV, False Imprisonment, with the following factual allegations:

8.   Mr.  Shannon  married  Defendant  Nermeen  Khalifa Shannon on March 3, 1996.

9.   Adam Osama Shannon was born on February 9, 1997.

10.   Jason Osama Kalifa [sic] was born on January 10, 2001.

11.   Mr. Shannon and defendant Nermmen Khalifa Shannon separated in January 2000.

12.   In February 2001 this Court entered a consent order that granted Mr. Shannon custody of Adam;  and Nermeen custody of Jason.

13.   Each parent also had visitation rights with their non-custodial child.

---

second question.   A recent case, *Lloyd v. General Motors Corp.*, 397 Md. 108, 154, 916 A.2d 257, 284 (2007), discussed the elements of the tort of civil conspiracy.

14. On August 18, 2001, Defendant Afaf Nassar Khalifa flew to Washington, D.C. from Egypt and stayed with Nermeen Shannon in her apartment.

15. Mr. Shannon agreed that both boys could visit a cousin in Brooklyn, New York with Defendants, Nermeen Khalifa Shannon and Afaf Nassar Khalifa, as long as the boys were returned to him by Sunday night, August 26, 2001.

16. The boys were not returned to Maryland.

17. The Defendants had previously and calculatedly arranged to put the boys on an airplane to Egypt.

18. The Defendants did put the boys on an airplane to Egypt and Mr. Shannon has not seen his American sons since August 2001.

19. Defendant, Afaf Nassar Khalifa was extradited to Maryland.

20. Defendant, Afaf Nassar Khalifa was sentenced to a ten year prison term. That sentence was later revised to a three year sentence.

21. The abductions and kidnapping [sic] of the children are ongoing.

\* \* \*

23. At the time of the abductions. Mr. Shannon was legally entitled to custody of Adam and visitation with Jason.

24. The Defendants intentionally interfered, and continue to interfere with Mr. Shannon's custody and custody [sic] and visitations rights by abducting the children to Egypt and refusing to return them.

25. The Defendants intentionally interfered, and continue to interfere with Mr. Shannon's custody and visitation rights by knowingly and intentionally refusing to allow Mr. Shannon to see or communicate in any manner with his sons.

26. As a result of the Defendants' ongoing and continuing intentional interference with Mr. Shannon's custody and visitation rights, Mr. Shannon has suffered damages.

Afaf Nassar Khalifa was served with the Complaint and a writ of summons while serving a three-year sentence, after she had been convicted of conspiracy and abduction under Section 9–305 (1984, 1999 Repl.Vol.), and amended Section 9–305 (1984, 1999 Repl.Vol., 2002 Supp.) of the Family Law Article.[2] Her attorney moved to dismiss the Complaint for lack of personal jurisdiction and insufficiency of service of process, which the court denied.

After numerous attempts to serve Nermeen Khalifa Shannon, the court ordered alternate service by mail and by publication in *The Cairo Times.* Nermeen Khalifa, through the same attorney, subsequently moved to dismiss for lack of personal jurisdiction, insufficiency of service of process, lack of subject matter jurisdiction, and failure to state a claim upon which relief can be granted, which the trial court denied.[3] The complaints against the father-in-law and sister-in-law were later dismissed.

The case went to trial in December of 2006. At the close of argument, the court dismissed the false imprisonment and loss of society counts. After deliberating over the remaining counts of interference with custody and visitation rights and civil conspiracy and completing a special verdict form, the jury awarded Shannon $17,500 in attorney fees and costs; $500,000 in compensatory damages against each defendant; $900,000 in punitive damages against Afaf Nassar Khalifa and $1,100,000 million in punitive damages against Nermeen Khalifa Shannon. Appellants moved for a judgment notwithstanding the verdict, a new trial, and for remittur, arguing grossly excessive damages, all of which the Circuit Court denied. Appellants noted their appeal to the Court of the Special Appeals, and we issued a writ of certiorari prior to any proceedings in

---

**2.** We affirmed her conviction in *Khalifa v. State,* 382 Md. 400, 855 A.2d 1175 (2004).

**3.** We note that no Answer was ever filed, and no default judgment was ever requested or entered. Appellants, however, have not been adversely affected by their failure to file an Answer because the case was tried on the merits.

the intermediate appellate court. *Khalifa,* 400 Md. at 647, 929 A.2d at 889.

## II.  Background

Appellants contend that the Circuit Court erred when it denied their Motion to Dismiss the Complaint for failure to state a claim upon which relief can be granted, because Maryland does not recognize the tort of interference with custody and visitation.  Appellants alternatively posit that if Maryland recognizes the tort of interference with custody and visitation, the lower court erred when it refused to dismiss the complaint for failure to state a claim because a parent must plead and prove a child's services to maintain the cause of action, which did not occur in the present case, and also contend that if this Court accepts Comment d to the Restatement (Second) of Torts, Section 700 (1977),[4] which states that the loss of service element is not necessary, it will be creating new law, which cannot apply retroactively.  Appellants, further, contend that the jury's punitive damage award was excessive, because Shannon "placed no evidence whatsoever on the record of [Appellants'] ability to pay $900,000 and $1,100,000 in punitive damages, respectively;" because the punitive damage award "far exceeded [the $5,000] maximum monetary fine imposed by the Maryland Family Law Article for the same conduct;" and because the punitive damage award is not commensurate with other punitive awards in the State.[5]

---

**4.**  Restatement (Second) of Torts, Section 700, Comment d, states:

   d.  *Necessity of loss of service.*  Under the rule stated in this Section, loss of service or impairment of ability to perform service is not a necessary element of a cause of action.  The temporary absence of a child who is too young to perform service or the abduction of a hopeless invalid is actionable as well as the abduction of a child who actually renders service to the parent.  The deprivation to the parent of the society of the child is itself an injury which the law redresses.

**5.**  Although Appellants discuss bifurcation of evidence in their brief when challenging the excessiveness of the punitive award, we shall not address it because it was not included as a question in their brief.

Shannon counters each of these arguments. He contends that Maryland recognizes the tort of interference with custody and visitation rights, and that loss of services, as referred to in the *Restatement,* has not been included as a necessary element in the tort under our jurisprudence. With respect to damages, Shannon argues that the punitive damages award is not excessive because it is only twice as great as the compensatory award, it is commensurate with the heinousness of Appellants' conduct, and it is inapposite to compare a criminal fine, where the primary punishment is imprisonment, to punitive damages. Shannon also counters that he provided clear, convincing and uncontroverted evidence of the Khalifa's substantial wealth.

## III. Discussion

### A. Interference with Parent–Child Relations

This case presents issues regarding whether the tort of interference with custody and visitation rights exists, and whether a parent, who has both legal custody and visitation rights under court order at the time of the abduction and harboring of minor children, has to plead and prove that he or she has suffered an economic loss as a result of the abduction and harboring. As we have stated, "[t]he viability of a legal cause of action is clearly a question of law which, as with all questions of law, this Court shall review *de novo.*" *Wholey v. Sears Roebuck,* 370 Md. 38, 48, 803 A.2d 482, 487 (2002).

In the present case, as in any other, when " 'considering the legal sufficiency of [a] complaint to allege a cause of action for tortious interference, we must assume the truth of all relevant and material facts that are well pleaded and all inferences which can be reasonably drawn from those pleadings.' " *Lloyd v. General Motors Corp.,* 397 Md. 108, 121, 916 A.2d 257, 264 (2007) (alteration in original); *Sharrow v. State Farm Mut. Auto. Ins. Co.,* 306 Md. 754, 768, 511 A.2d 492, 499–500 (1986). "Mere conclusory charges that are not factual allegations may not be considered." *Lloyd,* 397 Md. at 121, 916 A.2d at 264–65, citing *Morris v. Osmose Wood Preserving,*

340 Md. 519, 531, 667 A.2d 624, 631 (1995); *Faya v. Almaraz,* 329 Md. 435, 443, 620 A.2d 327, 331 (1993). "Moreover, in determining whether a petitioner has alleged claims upon which relief can be granted, '[t]here is . . . a big difference between that which is necessary to prove the [commission of a tort] and that which is necessary merely to allege [its commission],' and, when that is the issue, the court's decision does not pass on the merits of the claims; it merely determines the plaintiff's right to bring the action." *Lloyd,* 397 Md. at 121–22, 916 A.2d at 265 (alterations in original), quoting *Sharrow,* 306 Md. at 770, 511 A.2d at 500. "Furthermore, the court must view all well-pleaded facts and the inferences from those facts in a light most favorable to the plaintiff." *Id.* at 122, 916 A.2d at 265, citing *Board of Education v. Browning,* 333 Md. 281, 286, 635 A.2d 373, 376 (1994).

This Court apparently first explicitly recognized the torts of abduction of a child from a parent and harboring in *Baumgartner v. Eigenbrot,* 100 Md. 508, 60 A. 601 (1905). In *Baumgartner,* an aunt, who had legal guardianship over a teenage girl, sued a husband and wife with whom the girl had chosen to live, alleging that they had abducted the child and harbored her after she had been so abducted. The complaint specifically alleged that defendants abducted and knowingly deprived the aunt of the young woman, that the aunt "became greatly attached to her," and that the aunt "derived great comfort from [the child's] society as she grew to be larger," thereby incurring non-economic losses. *Id.* at 509, 60 A. at 601. The trial judge had directed a verdict because of insufficiency of the evidence, and we affirmed, opining that the evidence was not sufficient to meet the elements of abduction and harboring, which we declared were tortious acts:

> "Abduction, in its broadest legal sense, signifies the act of taking and carrying away by force, which may be by fraud, persuasion, or open violence, a child, ward, wife, etc. In its more restricted sense it is confined to the taking of females for the purpose of marriage, concubinage, or prostitution."

*Id.* at 513, 60 A. at 603, quoting 1 Encyclopedia of Law and Procedure 141 (1901), as well as:

"Abduction is the unlawful taking or detention by force, fraud, or persuasion of a person, as a wife, a child or a ward, from the possession, custody, or control of the person legally entitled thereto."

*Id.*, quoting 1 American and English Encyclopedia of Law 163 (2d ed. 1896), and finally: [6]

"In the law of torts, to harbor is to receive, clandestinely or without [legal] authority, a person for the purpose of so concealing him, that another having the right to the [legal] custody of such persons shall be deprived thereof; ... or, in a less technical sense, it is a reception of persons improperly."

*Id.* (alteration in original), quoting 15 American and English Encyclopedia of Law 285 (2d ed.1900). After iterating the rule for abduction, we determined that the evidence was insufficient to meet the elements of abduction and harboring:

Now, in all this there is not an element of abduction as it has been defined in the authorities cited in an earlier part of this opinion. Confessedly there was no force used. There was no fraud. There was no open violence and there is no evidence to indicate that there was persuasion of any kind. It would be going a long distance beyond what any case has held to say that the facts we have heretofore given in detail fasten upon the defendants or either of them the charge of abduction. And as to the second count of the declaration there is not any evidence whatever to show that Matilda was

---

**6.** The American and English Encyclopedia of Law, in the section subsequent to that cited by the court in *Baumgartner*, included the following:

IV. ABDUCTION OF CHILD—1. **Rights of Parents—General Rule.**—A father has a right of actions against every person who knowingly and wittingly interrupts the relation subsisting between himself and his child by enticing or abducting such child away from him, or by harboring the child after he has left the father's house.

\*      \*      \*

**2. Gist of the Action**—The gist of the action for the abduction of a child would seem to be not the loss of service, but the loss to the parent of the comfort and society of the child, though the authorities are not in harmony upon the question.

received clandestinely for the purpose of concealing her from the plaintiff nor is there anything to indicate that her reception by the defendants was in any sense improper. We conclude, then, from this review of the evidence in the record that the court below was entirely right in declining to permit this case to go to the jury. As we find no error in any of its rulings the judgment which was rendered in favor of the defendants will be affirmed with costs.

*Id.* at 516, 60 A. at 604.

By doing so, we held that a cause of action was viable against one who abducted a child from a custodian and harbored her. Clearly, the definitions of the torts and our acknowledgment of their existence were "pivotal" and necessary premises upon which our ultimate conclusion was based, and thus, were holdings in the case. *See* Black's Law Dictionary 749 (8th ed. 2004) (A holding is a "court's determination of a matter of law pivotal to its decision" or a "ruling on evidence or other question presented at trial."). *See also Howell v. Howell,* 162 N.C. 283, 78 S.E. 222, 224 (1913) (*Baumgartner* "held that if the child was kept in defendant's custody in a clandestine manner an action would lie").

Our acknowledgment of the torts of abduction and of harboring in *Baumgartner,* furthermore, was consistent with substantial authority from many of our sister states, who also were original American colonies, facing the same question. In what appears to be the earliest known and most frequently cited American case on abduction, the South Carolina Court of Law in *Kirkpatrick v. Lockhart,* 4 S.C.L. (2 Brev.) 276 (1809), although primarily concerned with whether it was appropriate to plead abduction in trespass *vi et armis* or in trespass on the case, relied primarily on the English case, decided in 1600, *Barham v. Dennis,* 78 Eng. Rep. 1001, and held that a father could sustain an abduction action not only for his son and heir, but for the abduction of any one of his children:

It has been decided, that a father may maintain an action of trespass *vi et armis,* for entering his house, assaulting his daughter, and getting her with child, *per quod,* 3 Wils. 18.

So, an action on the case lies for *debauching* his daughter, *per quod servitium amisit,* though she be above the age of twenty-one years, where acts of service are proved. 2 D. and E. 166 and seq. It was always held to lie where the daughter is under twenty-one, though no acts of service are proved, 2 D. and E. 4, 5; and other evidence, besides what applies to loss of service, is admissible. 3 Esp. R. 119. 8 D. and E. 534. I mention these cases, to exhibit the true foundation of these kinds of actions. . . .

*     *     *

The true ground of action cannot be the loss of service, for a child may be of an age so tender, or of a constitution so delicate, as to be incapable of rendering any service. The true ground of action is the outrage, and deprivation; the injury the father sustains in the loss of his child. . . .

Years later, in *Howell,* 78 S.E. at 222, the Supreme Court of North Carolina, when presented with facts remarkably similar to the instant case, also recognized the tort of abduction. In *Howell,* a father and mother entered into a contract prior to divorce, under which their daughter would remain in the mother's custody until the age of six, at which time the father would become the custodian. Shortly before the child attained the age of six, the mother and her partner abducted the child, and the father sued for damages. In reversing the trial court's dismissal for failure to state a claim, the Supreme Court of North Carolina discussed at considerable length the history of the tort of abduction in English common law, including *Barham,* and held that the torts of abduction and harboring were recognized and that a father could bring the cause of action for any of his children:

At the common law, abduction of a child was not an offense. *State v. Rice,* 76 N.C. 194. But Blackstone, 3 Com. 140, holds that a civil action lay therefor, and that a father could recover damages, though he says it was a doubtful question, on which the authorities were divided, whether a father could recover for the abduction of any other child than the oldest son and heir. In *Barham v. Dennis,* Cro. Eliz. 770, it

was held that he could not. But later cases held that an action would lie for taking away any of the children because the parent "had an interest in them all." It is interesting to quote the reasoning of the courts at common law as given in *Barham v. Dennis,* supra. Anderson, Walmsley, and Kingsmil, JJ., said: "The father should not have an action for the taking of any of his children, which is not his heir; and that is by reason the marriage of his heir belongs to the father, but not of any other his sons or daughters; and by reason of this loss only, the action is given unto him; the writ in the Register is for the son and heir, or daughter and heir only; which proves that the law has always been taken, that the action lies not for any other son or daughter. And although it hath been said that a writ of trespass lies for divers things whereof none of them are in the Register; and it hath been adjudged that it lies for a parrot, a popinjay, a thrush, and as in 14 Henry VIII for a dog; the reason thereof is, because the law imputes that the owner hath a property in them.... But for the taking of a son or daughter not heir, it is not upon the same reason, and therefore not alike. Here the father hath not any property or interest in the daughter which the law accounts may be taken from him." Glanville, J., dissenting, said: "The father hath an interest in every of his children to educate them, and to provide for them, and he hath his comfort by them; wherefore it is not reasonable that any should take them from him, and to do him such an injury, but that he should have his remedy to punish it." The majority of the court are sustained by the form of the writ as preserved in Fitz–Herbert's Natura Brevium 90 H., which was of date 12 Hen. IV, 16. But Judge Glanville based his dissent upon reason and justice and has been sustained by subsequent cases.

*Id.* at 223–24 (ellipsis in original).

Similarly, the Court of Appeals of New York conducted an extensive analysis of American and English common law in *Pickle v. Page,* 252 N.Y. 474, 169 N.E. 650, 651 (1930):

An action of trespass for the abduction of a child was originally maintainable by a father where the child abducted

was the son and heir and not otherwise. *Barham v. Dennis*, 2 Cro. Eliz. 770. This was "by reason the marriage of his heir belongs to the father, but not of any other his sons or daughters;" and, although it had been adjudged that the writ of trespass lay "for a parrot, a popinjay, a thrush, and, as 14 Hen. 8 is, for a dog; the reason thereof is, because the law imputes that the owner hath a property in them," whereas "the father hath not any property or interest in the daughter, which the law accounts may be taken from him." Later it was held that an action of trespass was maintainable by a father per quod servitium amisit where a child old enough to do him service, other than the heir, was abducted. For the abduction of any other child the action did not lie. *Gray v. Jefferies*, 1 Cro. Eliz. 55; *Hall v. Hollander*, 4 B. & C. 660. In the latter case it was said: "It is clear that in cases of taking away a son or daughter, except for taking a son and heir, no action lies, unless a loss of service is sustained, *Gray v. Jefferies*, supra; *Barham v. Dennis*, supra. The mere relationship of the parties is not sufficient to constitute a loss of service." In the case of an injury inflicted upon a child so immature that it was incapable of rendering service, the parent might have no remedy against the person inflicting the injury. *Hall v. Hollander*, supra. The principle that the abduction of a child, not the heir, or not capable of rendering service, was a wrong for which the law furnished no civil remedy, was not adopted without protest, nor has it received unqualified approval. Thus in *Barham v. Dennis*, supra, Glanville uttered a strong dissent, saying: "For the father hath an interest in every of his children to educate them, and to provide for them; and he hath his comfort by them; wherefore it is not reasonable that any should take them from him, and to do him such an injury, but that he should have his remedy to punish it." Blackstone was of the opinion that for the abduction of a child, other than the heir, a father might maintain an action, stating that such a wrong was "remediable by writ of ravishment or action of trespass vi et armis, de filio, vel filia, rapto vel abducto; in the same manner as the husband may

have it on account of the abduction of his wife." Bl. Comm. 140.

Based on this, the New York Court of Appeals concluded that the cause of action for abduction and harboring existed irrespective of loss of services:

In the absence of any New York authority upon the subject [of abduction and harboring] ... we are disposed to hold broadly, as have courts of North and South Carolina, that in actions for the abduction of immature children from the custody of their lawful custodians, parents, or foster parents, no loss of service need be alleged or proven; that for the direct injury done, a direct recovery may be had without resort to the fiction that a loss of service has been occasioned.

*Id.* at 653.

In a more recent case, *Murphy v. I.S.K.Con. of New England, Inc.,* 409 Mass. 842, 571 N.E.2d 340 (1991), which cited the Restatement (Second) of Torts, Section 700, the Supreme Judicial Court of Massachusetts held that the torts of abduction, harboring and enticement also were recognized causes of action under Massachusetts law and explained how these common law torts formed the basis for the single contemporary tort of interference with parent-child relations: [7]

"The common law has traditionally recognized a parent's interest in freedom from tortious conduct harming his relationship with his child," and the parent "may be compensated therefor when there is interference with the normal parent-child relationship." The tortious conduct referred to [in previous Massachusetts cases] includes the abduction, enticement, and harboring and secreting of minor children from their parents, or in other words, the intentional interference with parental interests or rights. The elements of these causes of action are well established. Abduction is the physical taking of a minor child from the parent having

---

7.  We recognized the common law tort action of enticement in *Kenney v. Baltimore and Ohio Railroad Co.,* 101 Md. 490, 61 A. 581 (1905), and *Loomis v. Deets,* 30 A. 612 (Md.1894).

legal custody. An action for enticement will lie where one, through an "active and wrongful effort" and knowing that the parent does not consent, induces a child to leave the parent's home. One "harbors" a minor child by inducing or encouraging a child, who is away from the parent without the parent's consent, to remain away from the parent.

\* \* \*

We therefore acknowledge the tort of intentional interference with the parent child relationship as a contemporary expression encompassing actions for abduction, enticement, harboring, and secreting of a minor child from the parent having legal custody.

*Id.* at 351, 352 (citations omitted).

In total, the torts of abduction and harboring have been recognized in at least eight of the other original American colonies. *See, e.g., Selman v. Barnett,* 4 Ga.App. 375, 61 S.E. 501, 502 (1908) (holding that one standing *in loco parentis* can seek general and punitive damages for the abduction and harboring of her child); *Plante v. Engel,* 124 N.H. 213, 469 A.2d 1299, 1301–02 (1983) (referencing the Restatement (Second) of Torts, Section 700 through common law torts of abduction and harboring); *Magee v. Holland,* 27 N.J.L. 86 (N.J.Sup.Ct.1858) (holding that a father could recover for the emotional harm caused by the abduction of his child); *Moritz v. Garnhart,* 7 Watts 302 (Pa.1838) (holding that one standing *in loco parentis* may maintain an action for the abduction of his daughter's illegitimate offspring). What we glean from these cases, and in particular those cases discussing the English common law, is that the torts of abduction and harboring existed in England prior to 1776, and that, therefore, we adopted them as part of our common law under Article V of the Maryland Declaration of Rights, which states in pertinent part that "the Inhabitants of Maryland are entitled to the Common Law of England ... according to the course of that Law, and to the benefit of the English statutes as existed on the Fourth day of July, seventeen hundred and seventy-six."

■ Nevertheless, this Court was not called upon to address whether abduction and harboring could be the basis of a cause of action for interference with parent-child relations until *Hixon v. Buchberger*, 306 Md. 72, 507 A.2d 607 (1986), when asked to confront the question of whether, under the common law of Maryland, a cause of action exists, or ought to be recognized, for money damages resulting from the intentional tortious interference by a non-custodial third-party with the visitation rights of a parent. Hixon was the noncustodial parent of a child born out of wedlock who complained of interference with his relationship with the child by the mother's fiancé, Buchberger, who allegedly made belligerent statements to him in the child's presence, made it physically difficult "at times" for Hixon to take the child with him, and intended "to supplant Hixon in the child's mind as the child's father"; *id.* at 74, 75, 507 A.2d at 608; Hixon never alleged that he was physically prevented from taking the child. Based on these allegations, the trial judge dismissed the complaint for failure to state a claim upon which relief can be granted.

In responding to the question posed to this Court by Hixon, Judge Lawrence F. Rodowsky, writing for this Court, analyzed the various causes of action that could have been implicated by the factual averments and concluded that Hixon's allegations were insufficient to sustain a cause of action for assault, battery or the intentional infliction of emotional distress:

While Hixon's point is that Buchberger's conduct is a tort for which money damages will lie, Hixon does not allege that the interference constituted an assault or a battery. The complaint does not undertake to describe conduct which is " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community,' " *Harris v. Jones*, 281 Md. 560, 567, 380 A.2d 611, 614 (1977) (quoting Restatement (Second) of Torts § 46 comment *d* (1965)), and Hixon does not argue that Buchberger committed an intentional infliction of emotional distress.

*Id.* at 77, 507 A.2d at 609. Judge Rodowsky immediately then opined that "[o]ur decisions involving interference with the relationship between parent and child do not assist Hixon's position," and recognized that abduction and enticement were the precursor causes of action for interference with parent-child relations. *Id.* at 77, 507 A.2d at 609, citing *Kenney v. Baltimore and Ohio Railroad Co.*, 101 Md. 490, 61 A. 581 (1905) (suit dismissed for insufficient evidence of enticement or service), *Baumgartner*, 100 Md. 508, 60 A. 601, and *Loomis v. Deets*, 30 A. 612 (Md.1894) (insufficient evidence of enticement or harboring). He then quoted with approval from the Restatement (Second) of Torts in which the elements of the tort are elucidated:

> [O]ne who, with knowledge that the parent does not consent, abducts or otherwise compels or induces a minor child to leave a parent legally entitled to its custody or not to return to the parent after it has been left him, is subject to liability to the parent.

*Id.* at 78, 507 A.2d at 610.

He continued the discussion with citation to the primary cases upon which Hixon relied, one being *Ruffalo v. United States*, 590 F.Supp. 706 (W.D.Mo.1984), in which a mother sued the government for tortious interference with the parent-child relationship when the government suddenly removed her child with his father and placed both in the Witness Protection Program in violation of her ongoing visitation rights. The mother alleged that she had habitually seen her child after school each day, that on the day of removal her child simply disappeared, and that she lost all contact with the child for nearly four years. Over the government's contentions that Missouri did not recognize a tort for interference with a parent's visitation rights, the United States District Court Judge determined that under state law a parent with either custody or visitation rights could pursue a cause of action for interference with the parent-child relationship. *Id.* at 713. *See also Raftery v. Scott*, 756 F.2d 335 (4th Cir.1985), in which the United States Court of Appeals for the Fourth Circuit affirmed a money judgment in favor of a non-custodial father

for the intentional infliction of emotional distress when the child's mother moved from New York to Virginia with the child, and the father did not discover the child's whereabouts for over four years; *L.S.J. v. E.B.*, 672 S.W.2d 937 (Ky.Ct. App.1984), permitting a non-custodial mother to counterclaim for damages for tortious interference when a child's foster parents brought an action to terminate the mother's parental rights in violation of the foster parent's agreement with the governing state agency; *Bartanus v. Lis*, 332 Pa.Super. 48, 480 A.2d 1178 (1984), allowing damages for intentional infliction of emotional distress based on wrongful enticement and harboring of a child away from the parent.

After elucidating the possible causes of action and discussing these cases, we concluded that Hixon failed to state a claim upon which relief can be granted because Hixon's factual allegations were insufficient, when juxtaposed against those allegations determined to be sufficient in other cases involving the tort of interference with parent-child relations:

> It is apparent from the foregoing review that the interference alleged here falls short, by a considerable distance, of the more substantial interferences presented in many of the cases relied upon by Hixon. The belligerent words described by Hixon are a relatively minor interference. Indeed, the nature of the interference alleged here is so minor that it is doubtful whether most courts would recognize it as mounting up to a tortious interference with custody rights, remediable by damages, were the same verbal exchange to have taken place when a custodial parent might be picking up a child at the end of a visit with a noncustodial parent. Consequently we need not decide in this case whether, or, if so, under what circumstances a damage action might lie for interference with visitation rights. We hold simply that a parent or that parent's ally who, without committing any tort presently recognized in Maryland, speaks hostilely to the other parent about that parent's exercise of custody or visitation rights does not thereby become liable in damages.

*Id.* at 83, 507 A.2d at 612. In concluding that Hixon's allegations were insufficient when compared to "the more substan-

tial interferences presented in many of the cases relied upon by Hixon," we not only recognized that the tort of interference with parent-child relations was extant, but also defined the elements and applied them to the factual allegations.[8]  *Id.*

In the present case, Shannon's Complaint is sufficient to have survived a motion to dismiss.  He alleged that the Appellants abducted and harbored his children in knowing interference with his custody right, when to obtain his consent they led him to believe that they were taking the boys to New York "to visit relatives" and would return them on Sunday, August 26, 2001, but in reality, they intentionally and "calculatedly" had planned to, and did, abduct the boys and harbor them in Egypt.  Shannon also averred that he was entitled to custody of the boys at the time when they were abducted and harbored because he had been granted legal custody of Adam and because with respect to Jason, he had a specific visitation planned for the night of August 26, 2001, and a right to ongoing visitation with him thereafter.  Assuming the truth of all well-pleaded, relevant, and material facts in the complaint and any reasonable inferences that can be drawn therefrom, we conclude that Shannon sufficiently alleged the elements of the tort of interference with parent-child relations and that the trial court did not err when denying the motion to dismiss for failure to state a claim upon which relief can be granted.

## B.  Loss of Services

Whether a parent must allege economic loss of the child's services to maintain an action for the interference with

---

8.  In *Lapides v. Trabbic*, 134 Md.App. 51, 65, 758 A.2d 1114, 1121 (2000), similarly, the Court of Special Appeals relied substantially on *Hixon*, and held that mere assertions that a defendant engaged in a course of conduct designed to win the affections of his daughter and undermine his parental authority were insufficient to sustain the cause of action of intentional interference with custody and visitation rights primarily because a parent must be physically deprived of the child.  In so holding, the intermediate appellate court distinguished Section 700 of the Restatement (Second) of Torts, from Section 699, which states that allegations of alienation of affection are insufficient to sustain a cause of action.  *Id.* at 58–59, 758 A.2d at 1117–18.

parent-child relations when the parent has custody and visitation rights regarding the children at the time the suit was brought is the next issue that we address. Although this Court's discussion in *Hixon* may have given the impression that loss of economic services was a mandatory element of the substantive tort of abduction, a focused analysis reveals that loss of services has never been an element of the tort itself, but rather, arose from common law pleading requirements in force in England, and Maryland, the latter at least until 1870.[9] When pleading was by form rather than by fact, a cause of action had to be alleged within the narrow constructs of predefined pleadings forms. *See* Paul Mark Sandler & James K. Archibald, Pleading Causes of Action in Maryland, at Prologue xx (3d ed.2004), quoting Alan H. Fisher, Essentials of Maryland Pleading 31 (2d ed.1922), in turn quoting *Andrew's Stephen,* Section 240 ("[W]hen special pleading was at its height, the rule was that all pleadings should be stated according to ancient and approved forms."). In the instance of interference with parent-child relations at common law, a parent seeking damages to redress the seduction, economic enticement, or abduction of a child had to plead their cause of action in trespass, which contained two subcategories: trespass on the case, or "case"; and trespass *vi et armis* (literally "with force and arms"), or simply "trespass." Poe, in 1 Pleading and Practice in Courts of Common Law, Section 158,

---

**9.** In 1856, the Maryland Legislature enacted the "simplification statute" which said in part:

> The forms of the pleadings which follow, shall be sufficient; and those and the like forms may be used, with such modifications as may be necessary to meet the facts of the case: but nothing herein contained shall render it erroneous or irregular to depart from the letter of such forms, so long as substance is expressed without prolixity.

1856 Md. Laws, Chap. 112.

In 1870, the General Assembly enacted Chapter 420, a precursor to Maryland Rule 2–303(b), to add the following provision, which closely approximates current Maryland law:

> Any declaration which contains a plain statement of the facts necessary to constitute a ground of action shall be sufficient, and any plea necessary to form a legal defense shall be sufficient without reference to mere form.

at 115–16 (5th ed.1925),[10] defined and distinguished case from trespass:

Trespass lies to recover *damages* for an injury committed with force, either actual or implied by law, where the injury is direct and immediate, and where it is committed either upon the person of the plaintiff, or upon his tangible and corporeal property, whether real or personal. Case, on the other hand, lies to recover *damages* for any wrong or cause of complaint to which covenant, assumpsit or trespass will not apply. Or to adopt another definition, more sharply contrasting it with trespass, it lies generally to recover damages for torts *not* committed with force, actual or implied; or, if committed with force, where the injury is not immediate but consequential; or, where the matter effected is not tangible. . . . An injury is considered immediate where it is occasioned by the act complained of itself, and not merely by a consequence of that act. In all other cases it is consequential.

(footnote omitted) (emphasis in original).

When a cause of action for interference with parent-child relations was on the case, the basis for the parent's, or more specifically, the father's recovery lie *per quod servitium amisisit* or in the right of a master in trespass to sue for injury to his servant. Damages, therefore, in such a *per quod* action were based on the injury to the master consequent from the injury to the servant, and a plea and proof of loss of the servant's services was thereby required. *See Mercer v. Walmsley*, 5 H. & J. 21, 27 (Md.1820). *See generally* 1 W. Blake Odgers & Walter Blake Odgers, The Common Law of England 561–64 (2d ed.1920).

An action in trespass, on the other hand, was premised on a direct injury to the father. A cause of action alleging abduction in trespass, therefore, included allegations that the father was directly wronged by the abduction because he was de-

---

10. This Court has cited Poe as authoritative most recently in *Hanna v. ARE Acquisitions, LLC*, 400 Md. 650, 661 n. 4, 929 A.2d 892, 899 n. 4 (2007).

prived of the comfort and society of the child, which as lawful custodian he had the right to expect and enjoy. Because this action was direct, the father pursuing the action in trespass was not required to prove loss of services, and he could be compensated for other damages both pecuniary and emotional. *Kirkpatrick*, 4 S.C.L. (2 Brev.) at 279 ("The true ground of action is the outrage, and deprivation; the injury the father sustains in the loss of his child; the insult offered to his feelings; the heart-rendering agony he must suffer in the destruction of his dearest hopes, and the irreparable loss of that comfort, and society, which may be the only solace of his declining age.").

Although in Maryland there is a dearth of authority addressing interference with parent-child relations when an *abduction* action was brought in *trespass*, this Court has decided a plethora of cases when the father either has brought the interference action on the case *per quod servitum amisit*, seeking damages for the seduction of his daughter, or when the father sought pecuniary damages flowing from the wrongful enticement of the son by an employer. In cases when a father brought an action for the seduction of his daughter, we explicitly required that the action be pled on the case *per quod servitum amisit*, stating that the father's right to consequential damages rested solely upon his legal right to the daughter's lost services. *See Lamb v. Taylor*, 67 Md. 85, 91, 8 A. 760, 761–62 (1887) (noting that loss of services is required in a seduction action because the right of action is based on the loss of service sustained by the plaintiff, not as father, but as master, in consequence of the seduction of his daughter and servant by the defendant); *Greenwood v. Greenwood*, 28 Md. 369, 373 (1868) (holding in an action on the case that a master-servant relationship must exist and that loss of services is the gist of the seduction cause of action); *Keller v. Donnelly*, 5 Md. 211, 214 (1853) (holding the right to maintain the seduction action is on the case in *per quod servitum amisit* and that "[t]he relationship of master and servant must exist either actually; that is, where the party seduced is rendering service to the plaintiff ... or constructively; that is, where the

plaintiff has a legal right to demand and have the services of the party seduced at the time of the seduction."); *Mercer,* 5 H. & J. at 26 (requiring the action be brought on the case and loss of services to be pled, but stating that the law implies the master-servant relationship from the father living with the daughter and that therefore "any slight service will be sufficient to raise the inference . . . that she was his servant").

When, similarly, a father brought an action for the enticement of his son into the employment of another, we also explicitly held that loss of services was a requisite element, either because the alleged damages were purely economic, *Loomis,* 30 A. at 613 (recognizing loss of service, but dismissing father's action for pecuniary damages primarily because the father originally consented to the son's employment and the employer did not harbor the son because he did not force the son to stay), or because the harm to the father was merely consequent to the death of the son. *Kenney,* 101 Md. at 493, 61 A. at 582 (holding insufficient evidence of loss of services when father sought damages consequent to losing the son's services when the son was crushed and killed by an engine while working in defendant's machine shop). *See also Monias v. Endal,* 330 Md. 274, 286, 623 A.2d 656, 662 (1993) ("[I]n tort actions where a family member is injured, the marital entity has a claim for damages for loss of a spouse's consortium, but parents and children do not have a claim for loss of each other's consortium. Parents have a limited common law claim for the economic value of the loss of an injured child's services, but children have no reciprocal claim for loss of an injured parent's services.").[11]

---

11. The requirement that the torts of economic enticement into employment and seduction, as opposed to abduction, must be brought on the case and that therefore loss of services must be shown, is consistent with the jurisprudence of other original colonial states. *E.g. Caughey v. Smith,* 47 N.Y. 244, 250 (1872) ("[T]o maintain an action for enticement . . . it must appear that the child . . . was at the time in the actual service of the parent or master."); *Lipe v. Eisenlerd,* 32 N.Y. 229, 238 (1865) (requiring master-servant relationship and loss of services in a seduction action); *Butterfield v. Ashley,* 60 Mass. 249, 251–52 (1850)

Although we have not had the opportunity to determine whether an abduction action would lie in trespass before the arcane common law pleading requirements were abolished in favor of fact-based pleading, where the type of action is based on the remedies sought,[12] numerous of our sister states, other original American colonies, have been presented with such an opportunity and have found strong support in the common law for permitting an abduction action to be brought in trespass. In a very early case, the South Carolina Court of Law, in *Kirkpatrick*, 4 S.C.L. (2 Brev.) at 276, analyzed the English common law and held that a father could bring an action in trespass for the abduction of any of his children. In *Kirkpatrick*, a father brought an action in trespass for the abduction of his daughter, *who was a minor*. The defendant asserted that the cause of action for abduction could not be brought in trespass, except in the instance of the father's son and only heir and moved to dismiss, arguing that the plaintiff's action must be brought "on the case" and that loss of services was required. *Id.* at 277. In rejecting the abductor's contentions and permitting the cause of action to be brought in trespass, the South Carolina Court summarized the debate at common law:

[There] seems to have been a matter of some doubt, formerly, as appears from Cro. Eliz. 770. . . . Mr. Justice Glanville, in opposition to the other judges, held that an action was maintainable, because a parent has an interest in all his children to provide for their education; and that the remedy ought not to be confined to the eloignment of the heir only. It does not appear that the question was ever settled; and

---

(requiring loss of services in an enticement action brought on the case by a father against a son's employer).

**12.** We recently have commented on the abandonment of form-based pleading in *Ver Brycke v. Ver Brycke,* 379 Md. 669, 696–97, 843 A.2d 758, 773–74 (2004). *See also Scott v. Jenkins,* 345 Md. 21, 27–28, 690 A.2d 1000, 1003 (1997) (noting that "Maryland abandoned the formalities of common law pleading long ago" and that Maryland Rule 2–303(b) establishes that "[a] pleading shall contain only such statements of fact as may be necessary to show the pleader's entitlement to relief or ground of defense").

there is reason to believe the other judges, who differed from Glanville, hesitated, and entertained doubts, and therefore declined deciding the question, without further consideration. The correct and judicious Sir Wm. Blackstone, seems to adopt the opinion held by Glanville, and says, "the remedy is by writ of ravishment of ward, or action of trespass *vi et armis, de filio, vel filia, rapto, vel abducto,*" and refers to Fitzherbert's *Natura Brevium,* 90, for the form of the writ. That able lawyer, Mr. Wooddeson, in his Lectures, vol. 1, p. 451, 2, says, "a father cannot sue for an assault and battery, committed on his son, but the son only must be the plaintiff. But if the father can allege, and prove, that his son was also his servant, and that by reason of the outrage he lost the profits of his labor, . . . the action would be maintainable. And in like manner," says he, "it seems just, that a father might sue for the abduction of any of his children, as well as of the heir, upon the suggestion, and proof, that by means thereof, . . . or, indeed, *without that harsher allegation,* it is but reasonable that he might bring such action, in respect of the comfort and delight he has in them, his anxiety for their loss, and his interest in their education; which considerations could hardly be recompensed by pecuniary damages." It has been decided, that a father may maintain an action of trespass *vi et armis,* for entering his house, assaulting his daughter, and getting her with child. . . . 3 Wils. 18. So, an action on the case . . . was always held to lie where the daughter is under twenty-one, though no acts of service are proved, 2 D. and E. 4, 5; and other evidence, besides what applies to loss of service, is admissible. 3 Esp. R. 119. 8 D. and E. 534.

*Id.* at 278 (emphasis in original). Accordingly, the South Carolina Court concluded that a father could recover monetary damages in trespass solely to compensate him for the emotional loss, irrespective of whether the child performed any actual services:

The true ground of action cannot be the loss of service, for a child may be of an age so tender, or of a constitution so delicate, as to be incapable of rendering any service. The

true ground of action is the outrage, and deprivation; the injury the father sustains in the loss of his child; the insult offered to his feelings; the heart-rendering agony he must suffer in the destruction of his dearest hopes, and the irreparable loss of that comfort, and society, which may be the only solace of his declining age.

*Id.* at 279.

Further, in *Pickle v. Page*, 169 N.E. at 650, the Court of Appeals of New York also concluded that at common law an action for abduction could be maintained in trespass and that loss of services was not a prerequisite element. In so concluding, the Court described the vigorous debate in older English cases over whether the right to bring an abduction action in trespass was limited to the first-born heir or whether it extended to the father's other children:

> An action of trespass for the abduction of a child was originally maintainable by a father where the child abducted was the son and heir and not otherwise. *Barham v. Dennis*, 2 Cro. Eliz. 770. . . . Later it was held that an action of trespass was maintainable by a father per quod servitium amisit where a child old enough to do him service, other than the heir, was abducted. For the abduction of any other child the action did not lie. *Gray v. Jefferies*, 1 Cro. Eliz. 55; *Hall v. Hollander*, 4 B. & C. 660. In the latter case it was said: "It is clear that in cases of taking away a son or daughter, except for taking a son and heir, no action lies, unless a loss of service is sustained." *Gray v. Jefferies*, supra; *Barham v. Dennis*, supra.
>
> *     *     *
>
> The principle that the abduction of a child, not the heir, or not capable of rendering service, was a wrong for which the law furnished no civil remedy, was not adopted without protest, nor has it received unqualified approval. Thus in *Barham v. Dennis* (supra) Glanville uttered a strong dissent, saying: "For the father hath an interest in every of his children to educate them, and to provide for them; and he hath his comfort by them; wherefore it is not reasonable

that any should take them from him, and to do him such an injury, but that he should have his remedy to punish it." Blackstone was of the opinion that for the abduction of a child, other than the heir, a father might maintain an action, stating that such a wrong was "remediable by writ of ravishment or action of trespass vi et armis, de filio, vel filia, rapto vel abducto; in the same manner as the husband may have it, on account of the abduction of his wife." Bl. Comm. 140. . . . It is to be noted, also, that Sir Frederick Pollock, without qualification, makes the broad statement: "The common law provided a remedy by writ of trespass for the actual taking away of a wife, servant, or heir, and perhaps younger child also;" and follows the statement by the further assertion that an action of trespass *also* lies for wrongs done to a plaintiff's wife, or servant or child, regarded as a servant, whereby the society of the former or the services of the latter are lost; the language of the pleading being per quod consortium, or servitium amisit. Pollock, The Law of Torts, p. 226.

*Id.* at 476–478, 169 N.E. 650 (emphasis in original). After so describing the debate at common law, the Court concluded, as discussed above, that abduction was a recognized cause of action in New York and then noted that on policy grounds it would be inapposite to strictly adhere to the legal fiction of loss of services:

It would be a reproach to our legal system if, for the abduction of a child in arms, no remedy ran to its parent, although "for a parrot, a popinjay, a thrush," and even "for a dog" an ample remedy is furnished to their custodian for the loss of their possession.

*Id.* at 653. The Court then distinguished abduction actions from seduction actions or actions to recover damages stemming from the physical injury of a child and determined that at common law loss of services was not required in abduction actions because the injury was directly inflicted upon the father and therefore was in trespass, and conversely that loss of services was required in seduction actions or in actions to recover economic damages stemming from physical injury

because under those circumstances the injury to the father was consequent to the injury to the child and thus was on the case:

> It is undoubtedly true that the gravamen of an action brought by a parent for the seduction of a daughter is loss of service. *Moran v. Dawes,* 4 Cow. 412; *Clark v. Fitch,* 2 Wend. 459, 20 Am. Dec. 639; *Hewitt v. Prime,* 21 Wend. 79; *Badgley v. Decker,* 44 Barb. 577; *Knight v. Wilcox,* 14 N.Y. 413; *Lipe v. Eisenlerd,* 32 N.Y. 229; *Lawyer v. Fritcher,* 130 N.Y. 239, 29 N.E. 267, 14 L.R.A. 700, 27 Am. St. Rep. 521.

*     *     *

> It is [also] true that for a loss of service resulting from a physical injury to a child ... neither damages for wounded feelings nor punitive damages may be awarded to a parent. *Whitney v. Hitchcock,* 4 *Denio,* 461; *Tidd v. Skinner,* 225 N.Y. 422, 122 N.E. 247, 3 A.L.R. 1145.

*     *     *

The rule is otherwise where the damage is not consequent but direct; where it results not intermediately from a physical injury to a third person, as a child, wife, or servant, but immediately from the wrong itself, as in case of the enticement away of a servant (*Smith v. Goodman,* 75 Ga. 198; *Bixby v. Dunlap,* 56 N.H. 456, 22 Am. Rep. 475); the enticement away of a slave (*Tyson v. Ewing,* 3 J.J. Marsh. [Ky.] 185); as in an action for criminal conversation with a wife (*Mathies v. Mazet,* 164 Pa. 580, 30 A. 434); or for the alienation of a husband's affection *Williams v. Williams,* 20 Colo. 51, 37 P. 614. In all these cases ... damages for wounded feelings and punitive damages may be awarded. That they may be awarded in actions brought by a father for the abduction of a child was definitely held in *Magee v. Holland,* supra. That decision was cited with approval in *Stowe v. Heywood,* 89 Mass. 118, 7 Allen (Mass.) 118, the court saying: "In an action for forcible abduction of children, the father is entitled to damages for the injury done to his feelings." We hold that they were recoverable here, and

that no error was committed when the trial judge instructed the jury that such damages might be considered and awarded by it.

*Id.* at 651, 653.

In *Howell,* 78 S.E. at 224, the Supreme Court of North Carolina reversed the lower court's dismissal for failure to state a claim and held that abduction had been recognized at common law and loss of services was not required:

> The most usual cases in which this action is brought have been upon the abduction of a daughter for marriage or immoral purposes. But the modern authorities, as we have said, have advanced, and now the parent can recover damages for the unlawful taking away or concealment of a minor child, and is not limited to cases in which such child is heir or eldest son, nor to cases where the abduction is for immoral purposes; nor are the damages limited to the fiction of "loss of services." This court pointed out, in *Hood v. Sudderth,* 111 N.C. 215, 16 S.E. 397, and *Willeford v. Bailey,* 132 N.C. 402, 43 S.E. 928, that this is "an outworn fiction" even in actions for seduction. The real ground of action is compensation for the expense and injury and "punitive damages for the wrong done him in his affections and the destruction of his household," as said in *Scarlett v. Norwood,* 115 N.C. 284, 20 S.E. 459; *Abbott v. Hancock,* 123 N.C. 99, 31 S.E. 268; *Snider v. Newell,* 132 N.C. 614, 623, 624, 44 S.E. 354.

The Court of Appeals of Georgia reached a very similar conclusion in *Selman,* 61 S.E. at 502. There, Selman, a grandmother who stood *in loco parentis* to her grandchild, sued Barnett for taking and carrying the child away and for harboring the child at Barnett's farm. Selman complained that as a result of the abduction she suffered severe emotional distress believing, among other things, that the child had been killed. The lower court dismissed Selman's action for failure to state a claim, and the Georgia Court of Appeals reversed. In so doing, the court held that the abducting and harboring of a child from one legally entitled to her is a harm inflicted

directly upon the person bringing the abduction action and that, therefore, general damages, as opposed to specific economic damages, were recoverable. *See id.* at 502.

In more recent cases in which arcane pleading requirements have been abandoned, the Restatement (Second) of Torts, Section 700, has been cited, and the courts have noted that requiring loss of services is both outmoded, *Plante,* 469 A.2d at 1301 (N.H.1983), and inconsistent with the common law understanding of the tort of abduction. *Murphy,* 571 N.E.2d at 352, citing *Rice v. Nickerson,* 91 Mass. (9 Allen) 478 (1864) (recognizing abduction as a tort committed directly against the father and awarding damages for costs incurred in regaining possession of the child without requiring a showing of lost services when a defendant wrongfully abducted the child from school and harbored the child away from the father thereafter).

Clearly abduction, the precursor to interference with parent-child relations, could have been brought in trespass or on the case at English and early American common law, and loss of services was not required when the action was pled in trespass. We recognized this in *Hixon,* when we acknowledged that economic loss may be an element of damages but that it is not required to be pled in order to maintain the cause of action; we stated that "[u]nder the rules for this tort espoused in the Restatement (Second) of Torts (1977), 'loss of service or impairment of ability to perform service is not a necessary element of a cause of action,' " and "[u]nder § 700, a custodial parent who suffers the tort can recover damages for the loss of society of the child, for emotional distress resulting from the abduction or enticement, for loss of service, and for the reasonable expenses of regaining the child and in treating any harm suffered by the child as a result of the tortious conduct." *Id.* at 77–78, 507 A.2d at 609–10. As we reflected in *Hixon,* without the artificial divisions, which in other times required a father to choose between damages directly related to the loss of a child's comfort and society and damages consequent to the loss of services, pleading requirements no longer serve to define the elements of the tort of interference

with parent-child relations and loss of services was never a substantive element.

## C. Visitation

The third issue in this case relating to the tort of interference with parent-child relations involves who can bring the cause of action;  Michael Shannon was the custodial parent of Adam but also the visitation parent of Jason at the time of the abduction in 2001 and throughout the ongoing harboring.[13] A parent with custodial rights clearly can initiate a cause of action for interference with parents-child relations. *See id.* at 78, 507 A.2d at 610; *Baumgartner*, 100 Md. at 508–09, 60 A. at 601; *Murphy*, 571 N.E.2d at 352.  The question of whether a visitation parent can sue for the tort and receive damages necessarily was addressed in *Hixon*, in which the relevant question before us was whether, under the common law of Maryland, a cause of action exists (or ought to be recognized) for money damages resulting from the intentional tortious interference by a non-custodial third-party with the visitation rights of a parent.  In *Hixon*, before determining whether a plaintiff could assert a tort claim for interference with visitation rights in Maryland, we had occasion to discuss *Ruffalo*, 590 F.Supp. at 706, the primary case upon which Hixon relied. In *Ruffalo*, a mother, who by agreement had visitation rights and one weekend day of "possession" of a child, sued the federal government under the Federal Tort Claims Act for interference with parent-child relations when the government placed the child and father in the Witness Protection Program because the father had cooperated with federal agents who were investigating a Kansas City crime organization.  The *Ruffalo* Court was called upon to determine, among other things, whether the government was subject to state law liability for interference with "visitation and communication" rights.  *Id.* at 708.  The court concluded that the claim was cognizable:

---

13.  Subsequent to the time when the children were taken to Egypt, Michael Shannon was granted custody of Jason Shannon.

> Assuming visitation rights to be mandated by state law . . .
> this means that entry into the [Witness Protection Program]
> . . . has had the effect of destroying a pre-existing legal
> right. Intentional interference with visitation rights may
> therefore be imputed to the government sponsor of the
> Witness Protection Program.

*Id.* After so holding, the court addressed the government's
argument that such an imputation would be to "encourag[e]
damage claims for petty infractions of parental rights." *Id.* at
712. The court noted that "state courts could well restrict this
type of claim to situations that are not 'insubstantial in
duration and effect,'" but went on to state:

> In any event, trifling departures from court orders relating
> to visitation doubtless already plague the state courts in
> contempt cases, and the possibility of truly petty damage
> suits does not argue persuasively against recognition of a
> right to sue. [On] the contrary, there are specialists in
> family law who view the potential of damage suits as a
> useful deterrent to lawless conduct.

*Id.* The *Ruffalo* Court, therefore, held both that the tort of
interference with visitation was recognized in Missouri and
also that the severity of the alleged interference was not an
aspect of liability but only of damages. *Id.* at 711. ("While
the injury to parental rights may be less severe in a case
involving what is usually called visitation, that is a matter of
degree that logically relates to damages rather than liability.")

   In *Hixon,* we accepted that part of the *Ruffalo* Court's
ruling that recognized interference with visitation rights as a
cognizable claim, but rejected the *Ruffalo* Court's conclusion
that even the most trivial departures from court-ordered
visitation could create a sustainable cause of action:

> This Court does not accept *"that portion of the reasoning* in
> *Ruffalo* which indicates that, because they deter (or might
> deter) illegal conduct, damage suits are a desirable remedy,
> *even for relatively minor interferences with visitations
> rights."*

*Hixon,* 306 Md. at 83, 507 A.2d at 612–13 (emphasis added).
Based on this understanding, we distinguished minor interfer-

ences with visitation from more substantial ones and held that Hixon failed to state a claim upon which relief can be granted because the interferences alleged fell short of the more substantial interferences complained of in *Ruffalo* and the other cases upon which Hixon relied:

> It is apparent from the foregoing review that the interference alleged here falls short, by a considerable distance, of the more substantial interferences presented in many of the cases relied upon by Hixon. *The belligerent words described by Hixon are a relatively minor interference.* Indeed, the nature of the interference alleged here is so minor that it is doubtful whether most courts would recognize it as mounting up to a tortious interference with custody rights, remediable by damages, were the same verbal exchange to have taken place when a custodial parent might be picking up a child at the end of a visit with a noncustodial parent.

*Id.* at 83, 507 A.2d at 612 (emphasis added). Accordingly, by dismissing Hixon's complaint as insufficient, we determined that Maryland recognizes a cause of action for interference with visitation rights so long as the alleged interference is not minor. *Id.*

Clearly, the Complaint in the present case alleges a major and substantial interference with visitation rights because Shannon stated that he has been deprived of his right to visitation from August 26, 2001, to the present. To be sure, the allegations of the abduction and harboring of Jason since August 26, 2001, are precisely the type of substantial interference contemplated by *Hixon*. The trial court, therefore, did not err in denying the motion to dismiss. In reaching this conclusion, however, we emphasize our admonition in *Hixon* that allegations of less than a major or substantial interference with visitation rights will not suffice to state a cause of action.

## D. Damages

Appellants also challenge the trial court's dismissal of their post-trial motions, arguing that the jury's punitive dam-

age award was excessive. In determining whether an award of punitive damages is appropriate, we have recognized that "[t]he factors limiting the size of punitive damages awards . . . are principles of law," *Bowden v. Caldor, Inc.*, 350 Md. 4, 47, 710 A.2d 267, 288 (1998), and "decisions on matters of law . . . are reviewed *de novo.*" *Renbaum v. Custom Holding, Inc.*, 386 Md. 28, 43, 871 A.2d 554, 563 (2005); *Davis v. Slater*, 383 Md. 599, 604, 861 A.2d 78, 80–81 (2004) (interpretations of the Maryland Code and the Maryland Rules are reviewed *de novo*); *Nesbit v. Gov't Employees Ins. Co.*, 382 Md. 65, 72, 854 A.2d 879, 883 (2004) (interpretations of Maryland statutory and case law are conducted under a *de novo* review).

We generally review punitive damages in light of nine, non-exclusive, legal principles articulated by Judge John C. Eldridge, speaking on behalf of this Court in *Bowden*, 350 Md. at 27–41, 710 A.2d at 278–85. In describing these factors we explained " 'that the factors are not criteria that must be established but, rather, guideposts to assist a court in reviewing an award,' " and that "not all . . . are pertinent in every case involving court review of punitive damages awards." *Id.* at 41, 710 A.2d at 285. In addition, we stated that the nine principles are "not intended to be exclusive or all-encompassing," and "[o]ther principles may appropriately be applicable to judicial review of punitive damages awards under particular circumstances." *Id.* Seven of the nine *Bowden* factors are relevant to the instant review: (1) the defendant's ability to pay; (2) the relationship of the award to statutorily imposed criminal fines; (3) the amount of the award in comparison to other final punitive damage awards in the jurisdiction and, in particular, in somewhat comparable cases; (4) the gravity of the defendant's conduct; (5) the deterrent value of the award both with respect to the defendant and the general public; (6) whether compensatory damages, including litigation expenses, sufficiently compensate the plaintiff, and (7) whether a reasonable relationship exists between compensatory and punitive

damages.[14]  We will address the first three factors individually, as Appellants do, and the remaining factors collectively.

In *Bowden* we recognized that the "amount of punitive damages 'should not be disproportionate to . . . the defendant's ability to pay'" because "[t]he purpose of punitive damages is not to bankrupt or impoverish a defendant." *Id.* at 28, 710 A.2d at 278.  In *Darcars Motors of Silver Springs, Inc. v. Borzym*, 379 Md. 249, 275–76, 841 A.2d 828, 843–44 (2004), however, we explicated:

> Sound reasoning supports our view that a plaintiff has no obligation to establish a defendant's ability to pay punitive damages.  Compelling a plaintiff seeking punitive damages to present evidence of a defendant's financial condition could, on the one hand, require a plaintiff with limited financial resources to wage a complicated discovery campaign against a monetarily sated defendant.  On the other hand, it would license the plaintiff to conduct extensive pretrial discovery of the defendant's finances to support a measure of damages that may never be awarded.  Not only could the latter result in a severe invasion of the defendant's privacy, but it could also unnecessarily cost the defendant a great deal of time and money to compile all of its financial information.

> Moreover, placing a burden on plaintiff to introduce evidence of a defendant's financial condition will enhance the risk that a jury will place undue emphasis on the defendant's wealth.  If that should occur, the jury may become more prone to use information of a wealthy defendant's finances to justify an award of punitive damages disproportionately higher than the gravity of the defendant's wrongdoing.  As we stated in *Bowden*, "merely because a defendant may be able to pay a very large award of punitive

---

**14.**  The other two factors from *Bowden v. Caldor, Inc.*, 350 Md. 4, 33–34, 710 A.2d 267, 281–82 (1998), whether "evidence of other final and satisfied punitive damages awards against the same defendant for the same conduct" should be considered; and, if separate torts are implicated, whether they grew out of the same occurrence or episode; are not implicated in the present case.

damages, without jeopardizing the defendant's financial position, does not justify an award which is disproportionate to the heinousness of the defendant's conduct." 350 Md. at 28, 710 A.2d at 279.

Based on these reasons, we see no reason to alter the way in which evidence of a defendant's ability to pay is presented. Consequently, a plaintiff does not bear a burden to present evidence of a defendant's financial condition in support of its pursuit of punitive damages.

The Appellants, nevertheless, argue that an award totaling $2,000,000 in punitive damages and $1,017,500 in compensatory damages cannot stand because there was no evidence at all on this record of their ability to pay damages. Their assertion, however, that there is nothing whatsoever in the record to provide a "guidepost" for determining their ability to pay punitive damages is rebuffed by Michael Shannon's uncontroverted testimony on direct examination:

Q ... Where does Afaf Khalifa maintain different residences?

A I stayed for four days at a beach house with Spanish marble in Al–Alemein on the Mediterranean coast. She told me it was valued at three million dollars. They have apartments in Alexandria, [Egypt] which is also on the Mediterranean coast about 50 miles to the east. We stayed there for one night. They have a 400–acre farm home, a farm in Giza with a three-story farmhouse that grows mangos and plantains and other vegetables and it's worked.

They also have a chalet outside Zurich, Switzerland. On the way to Egypt we stopped there for two days. It's in Coor, south of Zurich. They own a chalet there. And I've been to a home they own in San Marcos, California, just north of San Diego on the coast. So, I've been in six properties that they own.

Q How many cars to your personal knowledge have you seen at those residences?

*     *     *

A At the one in Al–Almein, there were two Mercedes and then four cars were kept at the Heliopolis complex.

Although the likelihood that the damages will bankrupt Appellants is a relevant consideration, we do not require Shannon to prove that appellants can pay nor do we require him to prove that the referenced properties were titled under their names. Shannon's uncontroverted testimony concerning the Khalifas' wealth is sufficient to conclude that the jury's $2,000,000 award is neither disproportionate nor excessive with respect to the Khalifa's ability to pay.

Appellants also argue that the damages are excessive because the punitive damages imposed total 180 times the maximum criminal fine of $5,000. In *Bowden*, 350 Md. at 30–31, 710 A.2d at 279–80, when setting forth the relationship of punitive damages to the criminal fine as a factor, we primarily relied on *Ellerin v. Fairfax Savings, F.S.B.*, 337 Md. 216, 242–43 n. 13, 652 A.2d 1117, 1130 n. 13 (1995), in which we offered that in the context of commercial activity, the cap on criminal fines of $1,000,000 for drug kingpins, $500,000 for commercial crimes in the antitrust area, and $10,000 for fraud may serve as a guide for legislative intent on punitive damage awards. We, however, also noted in *Bowden*, 350 Md. at 31, 710 A.2d at 280, that under other circumstances, such as when the principal sanction is imprisonment, the criminal fine may not be helpful:

Under some circumstances, the maximum criminal fine for comparable conduct should not be given very much weight in reviewing a punitive damages award for excessiveness. There are many serious criminal offenses chiefly aimed at individuals, rather than corporate entities, where the principal sanction is imprisonment, and the monetary penalty is relatively small.

Section 9–307(d) of the Family Law Article, Maryland Code (1999, 2006 Repl.Vol.), states that a person convicted of child abduction "is guilty of a felony and on conviction is subject to a fine not exceeding $5,000 or imprisonment not exceeding 3 years or both." This crime is chiefly aimed at individuals and

the severity of the three-year prison sentence, rather than the nominal $5,000 fine is the legislature's principal method of deterrence. This crime is also distinct from those commercial crimes described in *Ellerin,* where the fine is aimed at a corporate entity or ringleader, where the principal reason for engaging in the conduct is monetary gain, and where the fine generally is imposed to extract from defendants at least the amount by which they profited from the illegal activity. Because the fine called for under Section 9–307(b) of the Family Law Article bears no relationship to the purpose for committing the crime of abduction, which is aimed at individuals, and the fine is nominal in relation to the three-year prison sentence, it is not helpful in determining the appropriateness of punitive damages here.

Appellants, citing *Bowden,* 350 Md. at 31–33, 710 A.2d at 280–81, next assert that the $1,100,000 in punitive damage awarded against Nermeen Khalifa Shannon, and the $900,000 in punitive damages awarded against Afaf Khalifa are excessive in comparison to other punitive awards:

> Another appropriate consideration in judicially reviewing an award of punitive damages is to compare the award with other final punitive damages awards in the jurisdiction, and particularly with awards in somewhat comparable cases. *See, e.g., BMW of North America, Inc. v. Gore, supra,* 701 So.2d at 515 ("For guidance in determining the amount of punitive damages that would be proper, we have looked to comparable cases"). *See also Pacific Mutual Life Insurance Co. v. Haslip, supra,* 499 U.S. at 20–21, 111 S.Ct. at 1045, 113 L.Ed.2d at 21 (pointing to judicial review "undertak[ing] a comparative analysis" as an "additional check on the jury's ... discretion"); *Edwards v. Armstrong World Industries, Inc.,* 911 F.2d 1151, 1154 (5th Cir.1990).

In *Alexander & Alexander Inc. v. B. Dixon Evander & Assoc., Inc.,* 88 Md.App. 672, 720, 596 A.2d 687, 710–711 (1991), *cert. denied,* 326 Md. 435, 605 A.2d 137 (1992), Chief Judge Wilner for the Court of Special Appeals, in vacating an extremely large punitive damages award, stated:

On this record, we do not believe that a $12.5 million punitive award comports with [the law]. Although we cannot say with complete certainty that it is the largest punitive award rendered by a Maryland court, it is the largest, by far, of which we are aware. The nearest in amount was $7,500,000 rendered in *Potomac Electric v. Smith,* 79 Md.App. 591, 558 A.2d 768 (1989), and the nearest to that was $1,000,000, which we vacated in *Edmonds v. Murphy, supra,* 83 Md.App. 133, 573 A.2d 853 [(1990)]. Most of the punitive awards to date have been well under $100,000; other than the award in *Potomac Electric,* the highest allowed to stand was $910,000 against Exxon Corporation in *Exxon Corp. v. Yarema,* 69 Md.App. 124, 516 A.2d 990 (1986).

[T]he $12.5 million allowed by the court [is] extraordinary in terms of Maryland history. . . .

The cases in which punitive damages awards have been upheld by this Court are even more striking. Apparently the largest award of punitive damages which has ever been upheld by this Court was $700,000, and in that case the size of the award was not an issue before this Court. *Franklin Square Hosp. v. Laubach,* 318 Md. 615, 617–618, 569 A.2d 693, 694–695 (1990). The next ten highest awards of punitive damages upheld by us seem to be as follows: $107,875 (*St. Luke Church v. Smith,* 318 Md. 337, 568 A.2d 35 (1990)); $100,000 each for two plaintiffs, based on two separate acts of fraud (*Nails v. S. & R.,* 334 Md. 398, 639 A.2d 660 (1994)); $82,000 (*Luppino v. Gray,* 336 Md. 194, 647 A.2d 429 (1994)); $50,000 (*Macklin v. [Robert] Logan [Associates],* 334 Md. 287, 639 A.2d 112 (1994)); $40,000 (*Embrey v. Holly, supra,* 293 Md. 128, 442 A.2d 966); $36,000 (*Drug Fair of Md., Inc. v. Smith,* 263 Md. 341, 283 A.2d 392 (1971)); $35,000 (*General Motors Corp. v. Piskor,* 281 Md. 627, 381 A.2d 16 (1977)); $30,000 (*Great Atl. & Pac. Tea Co. v. Paul,* 256 Md. 643, 261 A.2d 731 (1970)); $25,000 (*Montgomery Ward & Co. v. Keulemans,* 275 Md. 441, 340 A.2d 705 (1975)); $25,000 (*American Stores Co. v. Byrd,* 229 Md. 5, 181 A.2d 333 (1962)). Moreover, in most of these cases no

argument was made that the punitive awards were excessive.

*Id.* (alterations in original). Although Appellants, following *Bowden,* cite cases regarding punitive damage awards, none of those cases involve the abduction and ongoing harboring of minor children from their father.

One jurisdiction has encountered similar circumstances and has affirmed a punitive damage award of $53,000,000 in favor of a mother when the children's father, with the help of his siblings and friends, who were also named as defendants, abducted and harbored their children in England. *Smith v. Smith,* 720 S.W.2d 586, 590–91 (Tex.App.1986). We do not believe that $1,100,000 in punitive damages awarded against Nermeen Khalifa Shannon nor the $900,000 in punitive damages awarded against Afaf Khlalifa are excessive.

We also conclude that the final four *Bowden* factors, the gravity of the defendant's conduct, the deterrent value of the award both with respect to the defendant and the general public, whether compensatory damages, including litigation expenses, sufficiently compensate the plaintiff, and whether a reasonable relationship exists between compensatory and punitive damages, justify the imposition of $1,100,000 and $900,000 in punitive damages. First, the evidence shows that Appellants activity is particularly heinous. In 2001, Appellants told Shannon that they were taking his sons Adam and Jason to New York and that they would return them thereafter; in reality, they put the young boys on a plane for Egypt, never to return. It is clear from the record that Appellants consciously and knowingly have deprived a father of the love and comfort of his two children for an extended period of time.

There is no evidence, furthermore, that Appellants have taken any action to rectify the situation. In *Bowden,* 350 Md. at 29, 710 A.2d at 279, when discussing the deterrent value of punitive awards, we noted that "a defendant's taking of remedial or corrective action, promptly after the misconduct giving rise to the award of punitive damages, obviously should be a mitigating factor." Rather, Appellants have done quite the

opposite, because as each day passes, Shannon is deprived of contact with the boys, who are now eleven and eight. We view Appellants' ongoing harboring of Shannon's children in Egypt as an aggravating factor, and a high punitive award is appropriate to deter others from engaging in similar conduct. Evidence of the ongoing absence of the children also indicates to us that Shannon will never be fully compensated for the loss of society and companionship that he has suffered at the hands of the Appellants.

The punitive damages, finally, bear a reasonable relationship to the compensatory damages. In *Franklin Square Hospital v. Laubach*, 318 Md. 615, 624, 569 A.2d 693, 697 (1990), for example, we affirmed an award of $700,000 in punitive damages and $300,000 in actual damages, a ratio of exactly 2.33 to 1. Here, the jury awarded $1,100,000 in punitive damages and $500,000 in compensatory damages against Nermeen Khalifa Shannon, a 2.2 to 1 ratio, and $900,000 in punitive damages versus $500,000 in compensatory damages against Afaf Khalifa, a less than 2 to 1 ratio.

In light of all of the factors, we conclude that the punitive damage award is neither excessive nor disproportionate.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**

RAKER, J., Concurs.

RAKER, J., concurring:

I concur in the judgment because I believe that this Court has the power to recognize a new cause of action in tort. I do not join the majority opinion because I believe that this Court has not heretofore recognized the cause of action in tort for interference with parent-child relations as finally stated by the majority.

I disagree with the Court's reading of *Hixon*. In my view, we did not recognized a cause of action in tort as set forth in the Restatement (Second) of Torts, § 700. In *Hixon*, this

Court observed that the belligerent words described by plaintiff were a relatively minor interference—indeed so minor that we doubted whether most courts would recognize it as amounting to a tortious interference with custody rights, remediable by damages. We held as follows:

> "Consequently we need not decide in this case whether, or, if so, under what circumstances a damage action might lie for interference with visitation rights. We hold simply that a parent or that parent's ally who, without committing any tort presently recognized in Maryland, speaks hostilely to the other parent about that parent's exercise of custody or visitation rights does not thereby become liable in damages."

*Hixon v. Buchberger,* 306 Md. 72, 83, 507 A.2d 607, 612 (1986). The Court in *Hixon*'s quotation of the Restatement (Second) of Torts, § 700 does not stand for the proposition that the Court adopted the tort as set out in that section. In fact, the Maryland cases cited by the *Hixon* court "state the prerequisites of that tort to be that the parent have the right to custody and that actual service have been rendered by the child to the parent which the parent lost due to the abduction, enticement, or harboring by the defendant." *Id.* at 77, 507 A.2d at 609.

In sum, if this Court chooses to recognize a new cause of action, we can do so, but we should say that is what we are doing, and why we are doing it. Otherwise, we should leave these policy decisions to the General Assembly, particularly in an area that has potentially far-reaching social and legal consequences and where the Legislature has previously acted. *See, e.g.,* §§ 9–304 to 9–307 of the Family Law Article, Md. Code (1984, 2006 Repl.Vol.).